# United States District Court
## SOUTHERN DISTRICT OF INDIANA

**UNITED STATES OF AMERICA**

**v.**

**CRIMINAL COMPLAINT**
SEALED
CASE NUMBER: 1:15-mj-888

| | |
|---|---|
| Luis Enrique BENITEZ a/k/a Luis Amaya a/k/a Keys a/k/a Kiki, | -01 |
| Juan MADRID, | -02 |
| Michael Antonio JOHNSON a/k/a Mike G, | -03 |
| Keith SPAIN a/k/a Juvy, | -04 |
| Antwone FARRAL a/k/a Chip a/k/a CP, | -05 |
| Barbara WHITLEY, | -06 |
| Christopher HARRIS, | -07 |
| Tyrika EVANS, | -08 |
| Darnell JACKSON a/k/a Crazy Folk, | -09 |
| Steven BARNES a/k/a Steve-O, and | -10 |
| Bryan HOWARD | -11 |

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

Count One - Commencing at a date unknown, continuing up to and including December 8, 2015, in the Southern District of Indiana, defendants Luis Enrique BENITEZ a/k/a Luis Amaya a/k/a Keys a/k/a Kiki; Juan MADRID, Michael Antonio JOHNSON a/k/a Mike G; Keith SPAIN a/k/a Juvy; Antwone FARRAL a/k/a Chip a/k/a CP; Barbara WHITLEY; Christopher HARRIS; Tyrika EVANS did conspire to distribute controlled substances, including 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Sections 841 and 846;

Count Two - On or about August 12, 2015, in the Southern District of Indiana, defendant Darnell JACKSON a/k/a Crazy Folk, who is a felon did possess a firearm, to wit: .40 caliber Ruger pistol, in violation of Title 18, United States Code, Section 922(g)(1);

Count Three - On or about October 8, 2015, in the Southern District of Indiana, defendant Steven BARNES a/k/a Steve-O, who is a felon did possess a firearm, to wit: a shotgun, in violation of Title 18, United States Code, Section 922(g)(1);

Count Four - On or about November 24, 2015, in the Southern District of Indiana, defendant Bryan HOWARD, who is a felon did possess a firearm, to wit: a .762 SKS rifle; a shotgun; and/or a Grendel Inc. .380 pistol, in violation of Title 18, United States Code, Section 922(g)(1).

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and that this complaint is based on the following facts:   **See attached Affidavit, continued on the attached sheet and made a part hereof.**

_____
Todd J. Bevington, Special Agent
ATF

Sworn to before me, and subscribed in my presence

December 8, 2015
**Date**

at   Indianapolis, Indiana

Mark J. Dinsmore, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Todd J. Bevington, being duly sworn under oath, states as follows:

**I.**
## TRAINING AND EXPERIENCE

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice.  I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been employed with the ATF since December of 2013 and I am currently assigned to the Indianapolis Field Office, Achilles Task Force. Prior to my employment with the ATF, I was employed as a police officer and detective with the Richmond, Virginia, Police Department for over thirteen years.  I spent approximately ten of those years assigned to various firearm and narcotics enforcement units, including over seven years with the Special Investigations Division-Narcotics Unit, Major Cases Team.  I was also assigned as a Task Force Officer (TFO) to the Federal Bureau of Investigation (FBI)-Safe Streets Task Force.  In connection with my official law enforcement duties, I investigate criminal violations of state and federal firearms and narcotics laws, including but not limited to, Title 18, United States Code, Sections 922 and 924; I also investigate criminal violations of money laundering laws, including Title 18, United States Code, Sections 1956 and 1957.  I have received special training in the enforcement of laws concerning controlled substances from the Drug Enforcement Administration (DEA), the Virginia Department of Criminal Justice Services (DCJS), the Richmond Police Department and the Federal Law Enforcement Training Center (FLETC).  I have testified in judicial proceedings and prosecutions for violations of firearms and controlled substances laws.  I have also been involved in various types of electronic surveillance and in the debriefing of defendants,

1

witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and the laundering and concealing of proceeds from drug trafficking.  I have participated in investigations involving the manufacturing, trafficking, and distribution of illegal narcotics.  I have utilized, and am therefore familiar with, the following investigative techniques: consensual and court-ordered electronic surveillance; physical surveillance; pole or other camera surveillance; trash covers; the development and operation of informants and cooperating defendants; the execution of search warrants; consent searches; undercover agent operation; Global Positioning Systems (GPS); parcel package drug interdiction; motel drug interdiction; highway drug interdiction; and the debriefing of defendants, witnesses, informants, and others who have knowledge of drug trafficking and of the laundering and concealing of proceeds from drug trafficking. I have received specialized training in the utilization of these investigative techniques, and have also received specialized training regarding the investigation of criminal gangs and other criminal enterprises.

3.      I have participated in federal electronic wiretap investigations involving individuals involved in the trafficking and distribution of controlled substances. I am familiar with the ways in which narcotics traffickers conduct their illicit business, including, but not limited to, their methods of importing and distributing controlled substances and their use of telephones and coded language to conduct their transactions.

4.      I know from my training and experience that individuals involved in the trafficking of controlled substances often maintain possession and control of firearms to attempt to protect themselves and their illegal controlled substances enterprise (that is, both their drugs and drug proceeds). Furthermore, drug traffickers will utilize those firearms as a means to intimidate or ensure the loyalty of their associates and/or subordinates and to prevent those with intimate knowledge of the organization from disclosing information to law enforcement.

## II.
## PURPOSE OF THE AFFIDAVIT

5.     This affidavit is submitted in support of the arrests of the following individuals, for committing:

a.     the crime of conspiring to distribute controlled substances, including 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Sections 841 and 846: Luis Enrique BENITEZ a/k/a Luis Amaya a/k/a Keys a/k/a Kiki; Juan MADRID, Michael Antonio JOHNSON a/k/a Mike G; Keith SPAIN a/k/a Juvy; Antwone FARRAL a/k/a Chip a/k/a CP; Barbara WHITLEY; Christopher HARRIS; Tyrika EVANS; and

b.     the crime of possession of a firearm by a previously convicted felon, in violation of Title 18, United States Code, Section 922(g): Darnell JACKSON a/k/a Crazy Folk; Steven BARNES a/k/a Steve-O; and Bryan HOWARD.

6.     This affidavit is also submitted in support of the application to search the following locations:

a.     the residence located at 4930 Patricia Street, Indianapolis, Indiana (the residence of Luis Enrique BENITEZ and Juan MADRID, further described in Attachment A);

b.     the residence located at 630 N. Livingston Avenue, Indianapolis, Indiana (the residence of Michael JOHNSON, further described in Attachment A);

c.     the residence located at 1213 N. Rochester Avenue, Indianapolis, Indiana (the residence of Antwone FARRAL, further described in Attachment A);

d.     the residence located at 3301 Gerrard Avenue, Indianapolis, Indiana (the residence utilized by Michael SEARCY and Antwone FARRAL, further described in Attachment A);

e.      the residence located at 3236 Donald Avenue, Indianapolis, Indiana (the residence of Keith SPAIN and Donald HINKLE, further described in Attachment A);

f.      the residence located at 1231 S. Moreland Avenue, Indianapolis, Indiana (the residence of Barbara WHITLEY, further described in Attachment A);

g.      the residence located at 5333 Holly Springs Drive E, Indianapolis, Indiana (the residence of Andre HARRIS, further described in Attachment A);

h.      the residence located at 3837 Bennett Drive, Indianapolis, Indiana (the residence of Kejuan HENDRICKS and Jimmy WELCH, and utilized by Otis BOOSE, further described in Attachment A);

i.      the residence located at 3430 Minger Road, Indianapolis, Indiana (the residence of Darnell KIMBROUGH, further described in Attachment A);

j.      the residence located at 1124 Hardin Boulevard, Apartment C, Indianapolis, Indiana (the residence of Lontrell SUTTON, further described in Attachment A);

k.      the residence located at 283 N. Belleview Place, Indianapolis, Indiana (the residence of Quietan ROBERTS, further described in Attachment A);

l.      the residence located at 3202 Normandy Road, Indianapolis, Indiana (the residence of Jonas DAY, further described in Attachment A);

m.      the residence located at 4413 Thrush Drive, Indianapolis, Indiana (the residence utilized by Michael JOHNSON, further described in Attachment A);

n.      the residence located at 4055 Pittman Place, Indianapolis, Indiana (the residence of Johnny HENDRICKS, further described in Attachment A);

o.      the residence located at 4710 Sheehan Place, Indianapolis, Indiana (the residence of Antonio ALLEN, further described in Attachment A); and

p.     the residence located at 950 N. Pershing Avenue, Indianapolis, Indiana (the residence of Dontrell HENDERSON, further described in Attachment A).

Since this affidavit is being submitted for the limited purpose of securing authorization for the arrests of the individuals named above in paragraph 5, and the search warrants for the locations listed above in this paragraph, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the required foundation for the complaint and search warrants requested herein.

## III.
## DRUG TRAFFICKING CO-CONSPIRATORS

7.     In late 2014, the ATF-Achilles Task Force, IMPD Southwest District Narcotics Unit and other law enforcement agencies commenced an investigation of an armed criminal drug trafficking organization operating in the Indianapolis, Indiana area, initially focusing on drug distributor Michael JOHNSON. According to information that other law enforcement officers and I have received from confidential sources described below, the Target Subjects identified during this investigation have been dealing in large amounts of controlled substances, including methamphetamine. Several of the Target Subjects who are prohibited from possessing firearms have been found in possession of firearms. As set forth below, this investigation culminated in the interception of multiple cell phones being used by JOHNSON, BENITEZ, and MADRID from approximately October 2015 through November 2015.

8.     In June of 2015, the ATF placed a pole camera at a location where activities at JOHNSON's former residence, 3010 Danbury Road, could be observed. Since that time, ongoing surveillance has demonstrated that JOHNSON lived at this residence with his girlfriend, Lashayna Brown, and several minor children until early November 2015, at which point, they all moved to 630 N. Livingston, Indianapolis, Indiana. Despite the presence of children, as set forth herein, JOHNSON currently distributes controlled substances from this residence (and also did so from Danbury Road). A

review of the pole camera footage from 3010 Danbury Road demonstrates that there was routinely heavy foot and vehicle traffic at this residence that is indicative of drug trafficking (that is, individuals arrive at the residence, and generally leave several minutes after arriving). A review of the pole camera footage from Danbury Road also demonstrates what appear to be several "hand to hand" narcotics transactions being conducted by JOHNSON in front of the residence. Target Subjects Donald HINKLE, Keith SPAIN, Antwone FARRAL, Andre HARRIS, Jonas DAY, Quietan ROBERTS, Lontrell SUTTON, Dontrell HENDERSON, and Darnell KIMBROUGH have also been observed coming and going from JOHNSON's residence during multiple surveillances during the course of this wiretap investigation.

9.     In July 2015, the ATF placed a pole camera at a location where activities at BENITEZ and MADRID's residence, 4930 Patricia Street, Indianapolis, Indiana, could be observed. Since that time, ongoing surveillance has demonstrated that no one other than BENITEZ and Target Subject Juan MADRID live at, or visit, this residence. I believe that BENITEZ and MADRID likely store the controlled substances at this residence.

Wiretap Investigation[1] Involving the Defendants

10.     On October 5, 2015, I received judicial authorization to intercept cellular phones belonging to Luis BENITEZ (Target Phone 1) and Michael JOHNSON (Target Phone 2). On October 16, 2015, I received judicial authorization to intercept another cellular phone belonging to Luis BENITEZ and Juan MADRID (Target Phone 3). On November 5, 2015, I received judicial authorization to intercept another cellular phone belonging to Michael JOHNSON (Target Phone 4). On November 17, 2015, I received judicial authorization to intercept another cellular phone belonging to Michael JOHNSON (Target Phone 5) and Juan MADRID and Luis BENITEZ (Target Phone 6). As set forth

---

[1] I have summarized portions of numerous calls that were intercepted during the course of this wiretap investigation. My interpretation of coded or cryptic language is contained in parentheses.

below, intercepts over these various target phones demonstrate that BENITEZ and MADRID have been distributing controlled substances, including methamphetamine, to individuals, including JOHNSON, FARRAL, and SPAIN; JOHNSON has further distributed methamphetamine to individuals such as WHITLEY, HARRIS and EVANS.

MADRID's Involvement in the Conspiracy

11.    BENITEZ went to California on or about October 12, 2015.  When he left, he left Target Phone 3 with MADRID, so that MADRID could continue to distribute controlled substances in BENITEZ's absence.  For example, at approximately 6:28 p.m. on October 16, 2015, MADRID called Andre HARRIS over Target Phone 3.  MADRID answered the phone and stated, "Yo, what's up man?" HARRIS replied, "What's up?" MADRID then asked, "No good news?" HARRIS affirmed, "No good news." MADRID stated, "Oh man!" HARRIS replied, "I know.  [U/I] check with Mike and see if his one little buddy, his one light skinned dude, see what he got (that is, HARRIS was telling MADRID to check with Michael JOHNSON to see if JOHNSON's associate had the quantity of narcotics that MADRID needs)." MADRID responded, "Yeah, I'm about to do that.  All right, call me if anything.  I just about to get a little bit.  I want, I want what you got, you know?" HARRIS responded, "All right, I'll see what I…I can get, I can get it but it'll be tomorrow.  I won't be able to get it today.  I just [U/I] (that is, HARRIS believed he will be able to obtain the quantity of narcotics that MADRID needed, but it would not be until the next day)." MADRID replied, "Yeah, just try to get me at least a half, a half or one, or…(that is, MADRID was reaffirming to HARRIS the quantity of narcotics that he needs)." HARRIS responded, "I'm going to have to go through a different dude, but I got you (that is, HARRIS was going to have to obtain the narcotics from someone other than his main source of supply, but HARRIS will be able to obtain it)." MADRID replied, "Hey, or fuck it, just tell him to bring the two and get one, do one.  I just need something, you know, cause I'm dry (that is, MADRID was telling HARRIS

7

to have his supplier bring a quantity of controlled substance. HARRIS could keep half and MADRID would get the other half. MADRID needs to obtain a resupply of narcotics because he is out)." HARRIS responded, "All right, it'll be tomorrow." MADRID responded, "All right, call me. What you think? What time or what?" HARRIS replied, "Uh, probably about one or two." MADRID asked, "Tomorrow?" HARRIS replied, "Tomorrow, yeah tomorrow. After two." MADRID replied, "All right, all right, I'll wait for you then." HARRIS replied, "All right."

12. At approximately 7:06 p.m. on October 18, 2015, MADRID received a call from Michael JOHNSON over Target Phone 3. MADRID answered, "Hey what's up, bro?" JOHNSON replied, "[U/I] need one to come through (that is, JOHNSON needed MADRID to bring him an ounce of methamphetamine." MADRID responded, "Yeah, all right. I'm at a market. Just give me like ten minutes, I'll be there." JOHNSON replied, "Okay." MADRID responded, "Alright."

13. At approximately 6:05 p.m. on October 25, 2015, MADRID received a call from Antwone FARRAL over Target Phone 3. MADRID answered the phone, "Yo! What up, what up, man?" FARRAL responded, "What's up with you?" MADRID replied, "Shit man, chilling, chilling just waiting on that stuff [U/I] still (that is, MADRID told FARRAL he was still waiting for a resupply of controlled substance)." FARRAL replied, "Yeah… yeah. You had me hyped up (that is, FARRAL told MADRID he had him excited thinking that MADRID was going to be able to obtain the quantity of controlled substance that FARRAL wanted)." MADRID asked, "Say what?" FARRAL responded, "I said, yeah I need pump up on that last… situation (that is, FARRAL is telling MADRID that he is trying to recover from losing money during a previous narcotics transaction)." MADRID replied, "Yeah, cus [stutters] they told me to and then I went to check it out and [stutters] it wasn't what it said it was, you know? It was, it was garbage, it was… remember the other one we had? The same… the same problem it was, I don't wanna have that problem, and I don't wanna put you in the situation either (that is,

MADRID believed he would be able to obtain FARRAL the controlled substance he wanted from an unknown source of supply. MADRID went to inspect the quality of the unknown controlled substance and believed it was very poor quality)." FARRAL replied, "Right, right." MADRID stated "You know? We are trying to get out the hole together not go back to that motherfucker (that is, MADRID is telling FARRAL that once his (MADRID's) resupply of narcotics arrives in Indianapolis they will be able to make money and not have to rely on an alternate source of supply who has poor quality product)." FARRAL responded, "Right, right." MADRID replied, "But hopefully, hopefully man this Wednesday or Thursday motherfuck this nigga said over there so... we are all waiting as soon... [Voices overlap] (that is, MADRID was telling FARRAL he is hoping the resupply of controlled substance will arrive on Wednesday or Thursday)." FARRAL responded, "Right, I need uh..." MADRID asked, "What's up?" FARRAL responded, "I need uh... one of Mike G's (that is FARRAL needed one ounce of methamphetamine)." MADRID clarified, "Give me one of Mike G's right now (that is, FARRAL was affirming that FARRAL needed one ounce of methamphetamine, like JOHNSON usually received)?" FARRAL replied, "Yeah." MADRID responded, "Okay, alright, I'll [Stutters] give me like forty minutes, and I'll get back to that side and I'll hit you up. Is that cool or what?" FARRAL responded, "Uh... just call my phone, you said about how long?" MADRID replied, "About forty minutes." FARRAL responded, "Yeah, call my phone when you are ready." MADRID replied, "Alright." FARRAL ended the call by responding, "Alright."

<u>November 18, 2015 Seizure of Methamphetamine</u>

14. At approximately 1:48 p.m. on November 18, 2015, JOHNSON and BENITEZ were intercepted over Target Phones 5 and 6. In this call, BENITEZ relayed that he was "riding around," and JOHNSON told him, "Okay, I'm a need you in a hot second...um, I think it's eight of them (JOHNSON was going to need eight ounces of methamphetamine from BENITEZ shortly)." BENITEZ asked for

confirmation: "Eight? ...Of that same, of the girl (eight ounces of methamphetamine)?" JOHNSON responded, "Yeah, yep, I'm about to, I'm 'bout to call (the intended customer) to see what's going on real quick. Imma call you back."

15.   JOHNSON and BENITEZ were intercepted again at approximately 1:53 p.m. on November 18, 2015.   In that call, JOHNSON asked BENITEZ where he was located, and when BENITEZ told him he was, "by Kessler at the golf course, close by," JOHNSON responded, "Okay, okay.  I need you to head to your way 'cause I got, a...one zone right now, then that, then a eight behind it (JOHNSON had a customer lined up to purchase an ounce of methamphetamine, and another prepared to purchase eight ounces of methamphetamine)."  BENITEZ asked how long the eight ounce customer would be ("Is he already there with you?"), and JOHNSON responded, "Huh-uh, the eight is on his way from out east...the one, the one, the one is about to be around the corner, down the street (the one ounce, but not the eight ounce, customer was nearby)."  BENITEZ told JOHNSON, "Hey, I'll see you at Mel's (4413 Thrush Avenue) in about five minutes."  At approximately 2:17 p.m. on November 18, 2015, JOHNSON and BENITEZ were again intercepted, with JOHNSON asking, "Where you at? Where you at?"  BENITEZ responded, "I'm pulling out, I'm pulling out, nigga.  I'm pulling out (BENITEZ was on his way over to 4413 Thrush Drive from 4930 Patricia Street)."  Shortly thereafter, surveillance officers observed the vehicles for both BENITEZ and JOHNSON arrive at 4413 Thrush Avenue.  Based on the investigation and events of that day, I believe that in this meeting, BENITEZ only dropped off the one ounce of methamphetamine, and that they met a second time for BENITEZ to drop off the eight ounces of methamphetamine.

16.   At 4:39 p.m. on November 18, 2015, JOHNSON and BENITEZ again spoke over Target Phones 5 and 6; in this call, JOHNSON relayed he was at 3010 Danbury Road ("I'm at my old apartment"), and told BENITEZ to come there.  Surveillance officers were at Danbury Road, and

observed JOHNSON with Christopher HARRIS and Tyrika EVANS.   However, it appears that JOHNSON might have spotted the surveillance officer, as he called BENITEZ back and told BENITEZ to meet him at 4413 Thrush Avenue ("meet at, at down where we was at earlier").   BENITEZ agreed to do so, and JOHNSON confirmed he still needed eight ounces of methamphetamine ("That's eight... Okay.").

17.     Surveillance officers then observed JOHNSON travel from Danbury Road in his vehicle, followed in tandem by a second vehicle containing HARRIS and EVANS. JOHNSON pulled his vehicle into the driveway at 4413 Thrush Avenue, and HARRIS/EVANS pulled in behind him.   Surveillance officers observed HARRIS exit his vehicle and get into the front passenger seat of JOHNSON's car; officers also observed JOHNSON enter 4413 Thrush Avenue.   Moments after JOHNSON, HARRIS, and EVANS got to the residence, BENITEZ also arrived at 4413 Thrush Avenue, and then walked into the residence.   JOHNSON exited the residence a short time later and re-entered his vehicle (which was still occupied by HARRIS).   HARRIS got out of JOHNSON's car moments later and then left with EVANS in the same car he had arrived in.   JOHNSON then got out of his car and went back into the Thrush Avenue residence.

18.     Officers followed the vehicle containing HARRIS (passenger) and EVANS (driver). After observing a traffic violation (cutting across three lanes of traffic on the highway to exit the highway without using a turn signal), a marked IMPD unit stopped that vehicle.   Upon approaching the vehicle, the officer smelled the odor of burnt marijuana, and searched the car.   HARRIS admitted that he had been smoking marijuana, and claimed he handed the marijuana blunt to EVANS.   The interdiction officer had been told that there was probable cause to believe that the vehicle contained eight ounces of a controlled substance; when the search of the car (and HARRIS) did not locate said controlled

substance, a female IMPD officer then searched EVANS, and located approximately eight ounces of methamphetamine on EVANS' person.

WHITLEY's Involvement in the Drug Conspiracy

19.     WHITLEY has been intercepted on multiple occasions talking to JOHNSON about what I believe to be drug trafficking activity.  For example, at approximately 6:12 p.m. on November 19, 2015, investigators intercepted a call between WHITLEY and JOHNSON over Target Phone 5.  During this call, WHITLEY told JOHNSON, "Do you want to come by and pick up your money?  And then whenever she gets here with the rest of it then I'll call you and we'll hook back up or do you…how do you want to do it (that is, WHITLEY was telling JOHNSON she had part of the money she owed him for a quantity of fronted methamphetamine.  WHITLEY was waiting for an unknown female to bring her the rest of the money WHITLEY owed JOHNSON, presumably WHITLEY had fronted a quantity of methamphetamine to the unknown female)?"  JOHNSON responded, "I got you.  I'll be that way (that is, JOHNSON was ready to deliver WHITLEY an additional quantity of methamphetamine to WHITLEY's residence at 1231 South Moreland Avenue)."  WHITLEY replied, "Um, well that's what I'm saying.  I don't want to get more than what I can chew until she pays this off.  That way I'm not biting off more than what I chew (that is, WHITLEY was telling JOHNSON not to front her an additional quantity of methamphetamine until she is able to pay him for the previous quantity of methamphetamine JOHNSON had given her)."  JOHNSON responded, "Okay."  WHITLEY continued, "You know—you know what I mean?  Um, but I got the eight ($800.00) right now until she comes here…you know what I'm saying?  If you need it right now then you're more than welcome to come get it or I'll meet you wherever, or whatever but um…yeah I, but I have to have a driver because I don't have any driver's license…they suspended my driver's license."  JOHNSON replied, "Damn." WHITLEY continued, "Yeah so I'm stuck with having to have a driver drive me, but if you want to

come to the house right now and get it then that's, that's fine." JOHNSON agreed to drive to WHITLEY's residence to pick up the money.

20.     At approximately 3:56 p.m. on November 20, 2015, JOHNSON called WHITLEY over Target Phone 5. During this call, JOHNSON told WHITLEY, "I was gonna hit you last night, I thought you was cool, I ain't know what was going on, but I had one for you (that is, JOHNSON was telling WHITLEY he had one ounce of methamphetamine for her)." WHITLEY responded, "I got your money, I just didn't ever call you [U/I] night cause I ended up going to bed." JOHNSON replied, "Well that's what I'm saying, I had one for you at the same time, that's why I was calling you." WHITLEY responded, "Oh [laughs]. Yeah, I've had the grandbaby all night, so I just kind of, you know, when he's around I don't try to…" JOHNSON interjected, "Oh, okay." WHITLEY continued, "…do too much. You know what I mean?  But I'm getting ready to go take him home right now, but I got your money though.  And whenever I get back and you want to come by and meet me or whatever, you're more than welcome to."

21.     Most recently, at approximately 1:13 p.m. on November 30, 2015, JOHNSON and BENITEZ were intercepted over Target Phone 6. During that call, JOHNSON told BENITEZ, "Imma still need that one (that is, JOHNSON needed BENITEZ to bring him one ounce of methamphetamine)." BENITEZ replied, "Alright.  You gonna [U/I] you gonna go take it to her?" Based on my involvement in this investigation, I believe that JOHNSON and BENITEZ were discussing WHITLEY as the intended methamphetamine customer.  This belief is corroborated by the fact that, following the conversation, JOHNSON met with BENITEZ and then JOHNSON was surveilled traveling to WHITLEY's residence at 1231 South Moreland Avenue in Indianapolis.

22.     Although we were no longer intercepting the content of communications over JOHNSON's Target Phone 5 by November 29, 2015, a  review of toll records for a new phone then

being used by JOHNSON demonstrates that JOHNSON had communicated with WHITLEY's phone a total of approximately eight times between November 29, 2015 and November 30, 2015.  I believe that these calls were in furtherance of the one ounce methamphetamine transaction described above.

### SPAIN and FARRAL's Involvement in the Methamphetamine Conspiracy

23.    On July 6, 2015, CS-1[2] contacted investigators and stated he/she had met with JOHNSON and BENITEZ at 3010 Danbury Road (JOHNSON's former residence).  CS-1 stated that during the meeting, he/she discussed future narcotics purchases from JOHNSON and BENITEZ.  CS-1 stated BENITEZ was driving a Honda sedan (and gave officers the same license plate as officers had observed BENITEZ driving on July 1, 2015).  Investigators told CS-1 the vehicle was registered to Keith SPAIN and asked if CS-1 recognized the name.  CS-1 stated SPAIN is an associate of BENITEZ and JOHNSON, and transports United States Currency and illegal narcotics between "the west coast" and Indiana.  CS-1 stated BENITEZ and JOHNSON told him/her that SPAIN was stopped by law enforcement while transporting United States Currency to "the west coast" and the currency was seized.  CS-1 was unaware of the amount of money seized or the location of the seizure.

24.    Through investigation, I have learned that on March 4, 2015, SPAIN was interdicted in Galesburg, Illinois (a town located southwest of Chicago) as SPAIN exited a bus from Indiana and was preparing to board a train to Los Angeles later in the day.  SPAIN was carrying approximately $9,200.00; when asked, SPAIN initially claimed that he had been given that money by friends and family to buy a car and stay in hotels in California.  SPAIN later changed his story and stated a friend

---

[2] CS-1 has a number of felony convictions, including convictions for: resisting law enforcement, possession of a controlled substance and dealing in a controlled substance.  CS-1 is cooperating with law enforcement in lieu of being arrested for possessing a controlled substance, dealing in a controlled substance and possessing an illegal firearm.  CS-1's information has been largely corroborated by independent police investigation, law enforcement databases and surveillance.  Further, CS-1 made statements implicating his/her involvement with the illegal distribution of controlled substances.  I am not aware of CS-1 making false statements to law enforcement.

named Darnell JACKSON had given him most of the money.  As set forth below at paragraphs 86 and 87, I believe that JACKSON is involved in the criminal activity.

25.     SPAIN and FARRAL have both been intercepted on numerous occasions during the course of this wiretap conspiracy discussing the distribution of controlled substances, including methamphetamine.  For example, at approximately 3:37 p.m. on October 26, 2015, MADRID used Target Phone 3 to speak with FARRAL.  In this call, FARRAL instructed MADRID to meet SPAIN at JOHNSON's residence with an ounce of methamphetamine: "Meet Juvy (SPAIN), uh, Mike G's house (at JOHNSON's residence)."  MADRID asked, "He's over there (was SPAIN currently at JOHNSON's house)?"  FARRAL responded that he would be there in ten or fifteen minutes.  MADRID confirmed, "Okay, meet him over there, right?"  FARRAL affirmed, "With, uh, with the one."  MADRID agreed to do so, and then concluded the call.  In a follow up call, FARRAL changed the location where MADRID was to provide the methamphetamine to SPAIN, telling him to go to "Kat's house (that is, Donald HINKLE a/k/a Fat Kat's residence, 3236 Donald Avenue)."  Surveillance officers were watching the pole camera at 3236 Donald Avenue, and confirmed that MADRID did, in fact, arrive at the Donald Avenue residence; surveillance officers further confirmed that SPAIN was also at this location.

26.     Upon arriving at 3236 Donald Avenue on October 26, 2015, MADRID got out of his vehicle and walked over to a vehicle containing SPAIN and HINKLE.  At that point, MADRID reached into his sweatshirt pocket, and appeared to hand an object to SPAIN; this object was consistent in size with the requested ounce of methamphetamine.  MADRID then left, and HINKLE got out of SPAIN'S vehicle and walked back into the Donald Avenue residence; at that time, SPAIN left the residence.

27.     After leaving Donald Avenue on October 26, 2015, SPAIN was observed leaving the residence of 1213 North Rochester Avenue a short time later.  After SPAIN left Rochester Avenue, at approximately 4:50 p.m., investigators intercepted a call from FARRAL to MADRID over Target Phone

3.  During this call, FARRAL told MADRID, "Yeah, I could see that extra bull crap that's in it too." MADRID asked, "Uh what?" FARRAL responded, "I said I could see the extra…uh, garbage (that is, FARRAL was complaining to MADRID about the quality of the methamphetamine SPAIN had just delivered.  FARRAL believed the methamphetamine was cut with a substance that would affect the purity level)." MADRID replied, "Nah, it's all good, you can ask Mike.  [U/I] that type of thing it's all good (MADRID was telling FARRAL the quality of methamphetamine was good.  MADRID told FARRAL that JOHNSON would be able to verify that the methamphetamine that MADRID distributes is high quality)." FARRAL responded, "Yeah, that stuff, that stuff at the bottom…you said it's all good (that is, FARRAL was reaffirming the methamphetamine he had just received from MADRID through SPAIN was good quality.  I do not believe that methamphetamine is the primary controlled substance that FARRAL distributes and his knowledge base regarding methamphetamine is limited)?" MADRID replied, "Yeah, yeah it's all good though." FARRAL responded, "That stuff at the bottom, I don't like that so…make sure when you do me don't…I don't want [U/I]—I don't know what that is."

28.     Keith SPAIN has continued his involvement in the drug conspiracy until the present time. For example, at approximately 9:43 a.m. on November 19, 2015, BENITEZ received an SMS message from Keith SPAIN over Target Phone 6.  This SMS message read: "Need a halftime.…I got that stack.…And I will paperwork tomorrow or Saturday…(that is, SPAIN needed BENITEZ to bring him a half ounce of unknown controlled substance.  SPAIN had $1000.00 to pay BENITEZ for a past drug debt.  SPAIN needed BENITEZ to front him the half ounce of an unknown controlled substance and he would pay BENITEZ for it on Friday or Saturday)."

29.     At approximately 12:29 p.m. on November 21, 2015, BENITEZ called SPAIN over Target Phone 6.  SPAIN answered the phone, "What's up, bro?" BENITEZ asked, "What's up?" SPAIN replied, "Shit, I see one of y'all called, one of y'all called me last night.  I don't know which one

16

(that is, SPAIN was telling BENITEZ he didn't know if BENITEZ or MADRID had called him)." BENITEZ replied, "Oh no, I'm just trying to see if you ready—remember what we got on (that is, BENITEZ was asking SPAIN if he remembered they were supposed to meet to conduct narcotics related business)?" SPAIN responded, "Yeah, I told, I told Juan Imma have it today.  Yeah, Imma have it today. Imma have it in a minute (that is, SPAIN was telling BENITEZ he was going to have the unknown amount of money to pay a debt to BENITEZ and MADRID)." BENITEZ replied, "Alright, that's cool. I'll give you a call later on." SPAIN responded, "Alright, bro." BENITEZ ended the call, "Yep."

30.     At approximately 11:51 a.m. on November 23, 2015, BENITEZ received an SMS message from Keith SPAIN over Target Phone 6.  This SMS message read: "I got you today bro, I fucked up and burned some shit on the stove....Bad loss for me...I'm going to need another half time today to..(that is, SPAIN was telling BENITEZ he was going to repay him from a previous drug debt. SPAIN had messed up an unknown quantity of controlled substance when he was cooking it on the stove, and he wasn't going to be able to re-sell that substance.  SPAIN was going to need BENITEZ to bring him another half ounce of controlled substance, presumably cocaine)."

31.     At approximately 12:19 p.m. on November 25, 2015, BENITEZ received an SMS message from Keith SPAIN over Target Phone 6.  This SMS message read: "I'm got to bust a move real quick, I should have more money when I get back...Call you in a hour (that is, SPAIN was telling BENITEZ he was going to conduct a drug transaction and would have the money he owed BENITEZ when he finished)."

32.     At approximately 4:49 p.m. on November 27, 2015, BENITEZ received an SMS message from Keith SPAIN over Target Phone 6.  This SMS message read: "Or 18.5 for the 1500 (that is, SPAIN was asking if BENITEZ would sell him 18.5 grams of controlled substance for $1500.00, presumably heroin)."

33.     At approximately 7:56 p.m. on November 28, 2015, BENITEZ received an SMS message from Keith SPAIN over Target Phone 6.  This SMS message read: "Need a whole of yellow (that is, SPAIN was telling BENITEZ he needed one ounce of heroin)."

34.     At approximately 11:22 a.m. on November 29, 2015, BENITEZ received an SMS message from Keith SPAIN over Target Phone 6.  This SMS message read: "I got 1500, can I get 18.5? Yellow…(that is, SPAIN was asking BENITEZ if he could get 18.5 grams of heroin for $1500.00)."

35.     Like SPAIN, FARRAL has also continued to engage in the drug trafficking conspiracy with BENITEZ.  Surveillance officers have most recently seen FARRAL meeting with BENITEZ on December 5, 2015.  On that occasion, at approximately 6:15 p.m., the GPS data on BENITEZ's vehicle demonstrated that BENITEZ left 4930 Patricia Street in his Honda Accord and proceeded directly to 3112 Medford Avenue.  At that point, surveillance officers witnessed BENITEZ arriving and parking in front of the residence, before proceeding inside.  Two other vehicles were also at the residence, a black Nissan (registered to Sheneka Hoskins at 3112 Medford Ave) and a white Buick Rendezvous (registered to Connie Gilbert @ 2108 Winchester Dr #1).  Approximately four minutes later, BENITEZ was witnessed exiting and leaving the residence.  Once in his Honda, BENITEZ was monitored by GPS, as he proceeded directly back to 4930 Patricia Street and parked in the garage.  Surveillance units remained in their positions of surveillance at 3112 Medford Avenue.  At approximately 7:00 p.m., surveillance units witnessed a dark colored SUV arrive at 3112 Medford Avenue, where it stayed for less than three minutes before leaving.  Surveillance units attempted to follow the vehicle for the purpose of conducting an interdiction stop, but they were unsuccessful in doing so.  At approximately 7:20 p.m., the Buick Rendezvous left the residence at 3112 Medford Avenue, and surveillance units followed from a distance. At approximately 7:33 p.m., an IMPD interdiction officer stopped the Buick in the vicinity of W 12th Street and North Alton Avenue.  The driver identified himself as "Antwante Farral" and stated that he

had just left his mother's and was going to his residence at 1213 N Rochester Avenue.  Officer Hadden issued FARRAL a verbal warning and released him from the scene, after conducting his investigation.

36.     In addition to FARRAL's involvement in the drug conspiracy, I believe that FARRAL is likely involved in other criminal conduct as well.   In mid-October 2015, CS-1 informed me that FARRAL had recently committed a home invasion robbery and had taken a kilogram of cocaine.  CS-1 was unaware of the location and/or victim of the home invasion.  I believe this information to be true based on an intercepted call over Target Phone 2 between JOHNSON and Otis BOOSE on October 20, 2015.  During this call, JOHNSON and BOOSE were talking about "Chip" (FARRAL).  JOHNSON told BOOSE that "he (FARRAL) done pulled some moves down and some shit man." JOHNSON went on to say that "he (FARRAL) on a, he on a hiding and shit right now (that is, FARRAL was not going to certain places because he is hiding, as a result of the recent home invasion robbery he had committed)."

## IV.
## EVIDENCE OF ADDITIONAL DRUG TRAFFICKING ACTIVITY

37.     In addition to the defendants named in the complaint, JOHNSON, BENITEZ, and MADRID have also been conspiring with additional individuals to distribute controlled substances.  A summary of some of the evidence regarding that drug trafficking activity is set forth below.

SUTTON's Involvement in the Drug Conspiracy

38.     At approximately 2:01 p.m. on October 7, 2015, JOHNSON received a call from Lontrell SUTTON over Target Phone 2.  During this call, JOHNSON asked, "What up?"  SUTTON replied, "Hey, I got this dude coming to get these two pack socks.  Two boxes of socks for [U/I].  I need you to make sure you got another one…I'm talking about, uh, not the second [U/I], but the white socks (SUTTON has a customer who wants an unknown quantity of controlled substance, believed to be cocaine)."  JOHNSON replied, "I know.  …Alright."

39.     At approximately 3:35 p.m. on October 8, 2015, SUTTON called JOHNSON on Target Phone 2. During this call, JOHNSON told SUTTON he was not at home and asked SUTTON, "Are you gonna—or want to meet somewhere right now?" SUTTON asked, "What, you got it, got it with you (SUTTON was asking JOHNSON if JOHNSON had the controlled substance with him that SUTTON wanted to purchase)?" JOHNSON replied, "No! Yeah right." SUTTON replied, "Oh [U/I] shit." JOHNSON responded, "You got to come to the house."  At approximately 6:36 p.m. on October 8, 2015, JOHNSON called SUTTON from Target Phone 2.  JOHNSON told SUTTON, "Yeah, I'm at the crib." SUTTON replied, "Ok." SUTTON was observed arriving at 3010 Danbury Road in his white work van. After leaving, SUTTON was followed by surveillance to the area of 1124 Hardin Boulevard.

40.     At approximately 2:33 p.m. on November 19, 2015, SUTTON called JOHNSON on Target Phone 5. During this call, SUTTON told JOHNSON he was going to pick up some money. JOHNSON told SUTTON, "I'm ready today." SUTTON replied, "Okay cool.  Soon as I get it bro, I'm on my way (that is, SUTTON was telling JOHNSON he would be coming to him to purchase an unknown quantity of controlled substance as soon as SUTTON picked up the money)." JOHNSON responded, "Alright, call me." SUTTON replied, "Make sure you put that to the side for me, man. I need that (that is, SUTTON was worried JOHNSON would sell the quantity of controlled substance SUTTON wanted before SUTTON was able to pick it up)." JOHNSON responded, "I already got it to the side for you.  It's over that way.  You already know (JOHNSON was assuring SUTTON he had set aside the quantity of controlled substance that SUTTON was coming to purchase from him)."

41.     At approximately 5:04 p.m. on November 19, 2015, JOHNSON called SUTTON from Target Phone 5. During this call, SUTTON tells JOHNSON he's ready to come meet him and stated, "Okay, don't forget about the half.  Alright (SUTTON was telling JOHNSON to make sure he brought an additional half ounce of unknown controlled substance)?" JOHNSON replied, "I got you.  I got you."

20

42. At approximately 6:11 p.m. on November 19, 2015, SUTTON called JOHNSON on Target Phone 5. JOHNSON answered the phone, "Give me a minute, cuz. I got you." SUTTON replied, "Yeah man, come on man...I got people waiting bro (SUTTON was telling JOHNSON that SUTTON had customers waiting to receive the controlled substance he was attempting to get from JOHNSON)."

43. At approximately 5:43 p.m. on November 25, 2015, SUTTON called JOHNSON on Target Phone 5. During this call, SUTTON told JOHNSON, "Cuz, let me run into you and get one real quick (this is, SUTTON needed to purchase one ounce of unknown controlled substance from JOHNSON)." JOHNSON told SUTTON, "I got you tomorrow, nigga." JOHNSON continued, "...I'm through for the night. Ain't doing shit."

Otis BOOSE's Involvement in the Drug Conspiracy

44. Otis BOOSE has assisted JOHNSON in JOHNSON's drug trafficking activities, and has allowed his residence, 3837 Bennett Drive, to be used by JOHNSON for these activities. For example, at approximately 1:38 p.m. on November 18, 2015, BENITEZ called Otis BOOSE from Target Phone 6. During this call, BENITEZ asked BOOSE, "What up dude?" BOOSE replied, "What up bro? Shit over here at mom's house, bout to make some calls and shit for you (BOOSE was telling BENITEZ he was at 3837 Bennett Drive). BENITEZ and BOOSE discussed individual(s) who were wanting to procure controlled substances from BENITEZ. BOOSE was referring to unidentified individual and told BENITEZ, "Yeah, yeah, yeah, Imma hit him up. I'm just getting over here. BENITEZ responded, "Uh okay, okay, just give me a call when he's there (that is, BENITEZ was telling BOOSE to call him when the unidentified individual arrived at 3837 Bennett Drive so BENITEZ could deliver the unknown quantity of controlled substance)."

45.     At approximately 9:56 p.m. on November 18, 2015, BOOSE called BENITEZ on Target Phone 6.  During this call, BOOSE told BENITEZ, "Shit uh, little bro and them on their way over here. Wanted to know if uh you wanted to slide through so we can all chop it up real quick (that is, BOOSE was asking BENITEZ if he could deliver an unknown quantity of controlled substance to 3837 Bennett Drive)?" BENITEZ told BOOSE to call him when they arrived and stated it would take him ten minutes to drive over to the residence.

46.     At approximately 10:05 p.m. on November 18, 2015, BENITEZ called BOOSE from Target Phone 6.  During this call, BENITEZ told BOOSE, "...if they close by so I can start heading that way." At approximately 10:07 p.m., BOOSE called BENITEZ on Target Phone 6.  BOOSE called BENITEZ and said, "Yeah, yeah, come on bro, he bout to pull up he said."  BENITEZ replied, "Alright." BENITEZ was witnessed leaving 4930 Patricia Street at 10:10 p.m. and driving directly to 3837 Bennett Drive, where he arrive at 10:17 p.m.

47.     At approximately 5:55 p.m. on November 20, 2015, BENITEZ received an SMS message from BOOSE.  This message read, "what's up bro I got a few MF hitting me up I need to talk to u bro (that is, BOOSE was telling BENITEZ that people were contacting BOOSE for the purpose of purchasing an unknown controlled substance.  BOOSE needed BENITEZ to supply him with the controlled substance)."

48.     At approximately 12:07 p.m. on November 22, 2015, BOOSE called JOHNSON on Target Phone 6.  During this call, BOOSE asked BENITEZ, "Where you at bro, bro?" BENITEZ told BOOSE he had just arrived at his residence (4930 Patricia Street) and asked, "Is Mikey already there (that is, BENITEZ was asking BOOSE if the customer waiting to receive an unknown quantity of controlled substance from BENITEZ was already as 3837 Bennett Drive)?" BOOSE responded, Yeah, he's been here." BENITEZ replied, "Alright.  Shit, I'll be there in five, ten minutes."  At approximately

12:23 p.m., BENITEZ called BOOSE from Target Phone 6 and stated, "Hey, I'm about to pull up." A review of the GPS track on BENITEZ's vehicle showed BENITEZ traveled from 4930 Patricia Street and arrived at 3837 Bennett Drive at approximately 12:28 p.m. At approximately 4:24 p.m. on November 22, 2015, BOOSE called BENITEZ on Target Phone 6. During this call, BOOSE told BENITEZ, "Got that for you, baby (that is, BOOSE had either money or an unknown quantity of controlled substance to give to BENITEZ)." BENITEZ told BOOSE he would come over to pick it up. BOOSE responded, "Yeah, I'm in the garage going some brakes."

49.     At approximately 5:08 p.m. on November 22, 2015, BENITEZ received a call from Otis BOOSE over Target Phone 6. BENITEZ answered the phone, "What up, bro?" BOOSE asked, "Where are you at, bro?" BENITEZ replied, "I'm still over here getting ready and showering it up." BOOSE responded, "Oh, okay.  I'm still here." BENITEZ replied, "Alright, I'll be over there.  Give me a minute." BOOSE responded, "That…he said uh…he might want something else.  I'll holler at you when you get here (that is, BOOSE was telling BENITEZ that an unknown male might want to purchase an additional quantity of unknown controlled substance from BENITEZ, through BOOSE)." BENITEZ replied, "Alright." A review of the GPS data on BENITEZ's vehicle showed he traveled from 4930 Patricia Street to 3837 Bennett Drive, arriving at approximately 5:57 p.m.

50.     At approximately 5:40 p.m. on November 28, 2015, BOOSE called BENITEZ on Target Phone 6.  During this call, BOOSE told BENITEZ, "I need to see you (BOOSE needed BENITEZ to bring him an unknown quantity of controlled substance)."  BENITEZ replied, "Oh, for what we talked about (BENITEZ was affirming he should bring the quantity of controlled substance that he and BOOSE had previously discussed)?" BOOSE replied, "Yeah, that and something else (BOOSE needed BENITEZ to bring the quantity of controlled substance they previously agreed on as well as an additional quantity)." BENITEZ asked, "Oh, you want me just go talk to real fast (BENITEZ was asking

BOOSE if he wanted BENITEZ to come talk in person with him about the additional quantity of controlled substance)?" BOOSE affirmed and BENITEZ stated "I'll be over there (BENITEZ would drive to 3837 Bennett Drive)."

51.     A review of the GPS data on BENITEZ's vehicle showed BENITEZ traveled from his residence at 4930 Patricia Street to 3837 Bennett Drive, arriving at approximately 6:19 p.m.  BENITEZ stayed at 3837 Bennet Drive for approximately six minutes (presumably delivering a quantity of controlled substance to BOOSE) before returning to 4930 Patricia Street.  BENITEZ remained at Patricia Street for approximately thirty-four minutes and then returned to Bennett drive for approximately two minutes (presumably delivering the additional quantity of controlled substance to BOOSE).

### Johnny HENDRICKS' Involvement in the Drug Conspiracy

52.     Johnny HENDRICKS has also been purchasing controlled substances from BENITEZ during the course of this conspiracy.  For example, at approximately 7:01 p.m. on November 17, 2015, HENDRICKS called BENITEZ over Target Phone 6 and stated, "Yeah, yeah, I'm 'bout to be pulling up at the car wash.  BENITEZ replied, "I Just left—I just left right there.  I been there for like fifteen minutes."  HENDRICKS replied, "Yeah, I'm about to pull up now."  BENITEZ replied, "Alright I'm bout.  I'm chilling back."   A review of the GPS on BENITEZ's vehicle showed he left his residence at 4930 Patricia Street and drove to the Crew Carwash at 4280 Lafayette Road.  After leaving the parking lot, BENITEZ returned after this call for approximately ninety seconds; I believe, based on investigation to date, that he did so to supply HENDRICKS with a quantity of controlled substance.  BENITEZ returned to 4930 Patricia Street after his return trip to the car wash.

53.     At approximately 1:56 p.m. on November 17, 2015, BENITEZ received a call from Johnny HENDRICKS over Target Phone 6.  During this call, HENDRICKS asked BENITEZ where he

was, and BENITEZ replied, "…uh right here at Thirty and Kessler."   HENDRICKS replied, "Alright, I'm right here, I'm right here, about to meet my little bitch up here at the car wash, man.  Uh, meet me up here so I can holla at you real quick."  BENITEZ asked, "At the car wash?"  HENDRICKS replied, "Yeah."  BENITEZ asked, "At the same spot (presumably the same spot BENITEZ met HENDRICKS the day before)?" HENDRICKS responded, "Yep."  BENITEZ told HENDRICKS he would "be there in five."  A review of the GPS track on BENITEZ's vehicle showed BENITEZ arrived at the car wash at approximately 2:04 p.m.    At approximately 2:40 p.m. on November 22, 2015, BENITEZ received another call from HENDRICKS over Target Phone 6.   BENITEZ answered the phone "Yeah?" HENDRICKS asked, "What's up?"  BENITEZ asked, "What's up, bro?" HENDRICKS responded, "Hmmmm?" BENITEZ replied, "Uh…shit, I'm—shit, I'm ready for you to see when you ready (that is, I believe BENITEZ and HENDRICKS had previously agreed to meet so HENDRICKS could purchase an unknown quantity of controlled substance from BENITEZ)." HENDRICKS replied, "Shit, um…I'm ready now.   Can you meet me over by that Applebee's?"  BENITEZ asked, "In how long?" HENDRICKS replied, "I could be there in about fifteen minutes."  BENITEZ told HENDRICKS, "…Okay, I'll leave from here…I'll be there in five."

54.     Pole camera and GPS surveillance on November 17, 2015 showed BENITEZ leave his residence and 4930 Patricia Street and drive directly to the Applebee's Restaurant where he met HENDRICKS.  Police surveillance observed BENITEZ get into the passenger side of a Dodge Ram pickup truck driven by HENDRICKS and conduct what appeared to be a "hand to hand" drug transaction with HENDRICKS.  BENITEZ left and returned back to the residence of 4930 Patricia Street.  Police surveillance attempted to follow HENDRICKS but lost the truck near West 62nd Street and Michigan Road.  The truck was located later that evening parked in the driveway of 4055 Pittman Place.

55.    On November 27, 2015, investigators were conducting surveillance on the residence of 4055 Pittman Place, HENDRICKS' residence.  At approximately 12:27 p.m., investigators observed HENDRICKS arrive at the residence driving the Dodge Ram pickup truck.  HENDRICKS entered the residence, and then left again in the pickup truck at approximately 12:54 p.m.  Surveillance followed HENDRICKS to a nearby gas station.  HENDRICKS pulled up to the gas pumps but was never observed getting any gas.  HENDRICKS was observed conducting what appeared to be "hand to hand" drug transactions with two unidentified individuals who walked up to the passenger side door (that is, HENDRICKS met with each individual briefly, they came within close physical proximity—close enough that HENDRICKS and the unidentified individuals could touch hands and conduct a drug transaction—and then the individual left the vehicle).  Following these two apparent drug transactions, HENDRICKS appeared to spot one of the surveillance officers, and was then observed leaving the gas station at a high rate of speed.  Surveillance efforts to keep up with HENDRICKS were unsuccessful. Officers went back near HENDRICKS' Pittman Place residence to attempt to reacquire their observation of HENDRICKS; while HENDRICKS was not then present, officers did see the Dodge Ram truck in a nearby apartment complex.  Officers reestablished surveillance at 4055 Pittman Place and observed HENDRICKS return to the residence driving a different pick up truck several hours after the events at the gas station.  HENDRICKS' conduct following the two apparent 'hand to hand' transactions (that is, his flight from the gas station, and his replacement of the truck he had been driving in favor of a different vehicle) would tend to corroborate my belief that HENDRICKS' activity at the gas station was drug related.

56.    On December 1, 2015, HENDRICKS was stopped by IMPD officers for a traffic violation driving a black colored Chevrolet Trailblazer.  Officers noted that HENDRICKS was in possession of four cellular telephones.  I know it is common for drug traffickers to carry multiple

cellular phones, so that they may compartmentalize their drug trafficking business (separate phones for separate categories of individuals/non-drug business), and to thwart law enforcement scrutiny.

57.     On December 5, 2015, investigators were conducting surveillance on the residence of 4055 Pittman Place. Surveillance officers observed an unidentified individual sitting in a car in front of the house. HENDRICKS was observed arriving in the black colored Chevrolet Trailblazer a short time later. The unidentified male exited his vehicle (left vehicle running) and walked into the residence with HENDRICKS. This male exited the residence a few minutes later and drove away. Several minutes later, a second unidentified male arrived and parked in front of the residence. The unidentified male entered the residence and left the residence less than two minutes later.

### Dontrell HENDERSON's Involvement in the Drug Conspiracy

58.     Dontrell HENDERSON has been involved in drug trafficking with Michael JOHNSON through the course of this investigation. For example, at approximately 2:44 p.m. on October 7, 2015, JOHNSON received a call from HENDERSON over Target Phone 2. During this call, HENDERSON asked JOHNSON, "You all good around there (that is, did JOHNSON have controlled substances available to sell)?" JOHNSON replied, "Yeah." HENDERSON replied, "Alright. It's cool if I slide that way (that is, could HENDERSON come to JOHNSON's residence at 3010 Danbury Road to pick up an unknown quantity of controlled substance)?" JOHNSON replied, "Yeah, come holler at me." A short time later, investigators monitoring the pole camera at JOHNSON's residence observed HENDERSON arrive in a Pontiac Grand Prix registered to HENDERSON. HENDERSON entered JOHNSON's residence and left in the Pontiac approximately ten minutes later. I believe that on this occasion, HENDERSON obtained controlled substances from JOHNSON.

59.     At approximately 4:45 p.m. on October 27, 2015, JOHNSON received a call from HENDERSON over Target Phone 2. During this call, HENDERSON asked JOHNSON, "Shit, you all,

you all good (that is, did JOHNSON have an unknown type on controlled substance, presumably cocaine)?" JOHNSON replied, "Hell no!" HENDERSON responded, "No good?  Damn!" JOHNSON continued, "No good at all!" HENDERSON replied, "Alright man, I'll get back with you.  It's ugly everywhere I see (that is, HENDERSON had been having trouble finding the controlled substance he was looking for)." JOHNSON affirmed, "Oh yeah, it's been fucked up." HENDERSON replied, "Yep, that's why I focus on that other shit." JOHNSON laughed.  HENDERSON asked, "Hey, you been, you been getting down on that?" JOHNSON asked, "On uh, pit bull (heroin)?" HENDERSON replied, "Yeah, I got plenty of that." JOHNSON went on to tell HENDERSON, "I can get that all the way." HENDERSON asked, "Oh you too?" JOHNSON replied, "Yep." HENDERSON responded, "Oh yeah, just in case you run out of something, you can always hit me.  I keep plenty of it."

60.    On December 5, 2015, investigators talked to a confidential source of information regarding HENDERSON (hereinafter, the SOI)[3].  The SOI stated he/she had observed HENDERSON distributing heroin in the Haughville area of Indianapolis within the past week.  Further, the SOI has known that HENDERSON has been a distributor of heroin in Haughville for the past several years.

61.    On December 6, 2015, HENDERSON was observed sitting in a black colored GMC SUV on the curtilage of 950 Pershing Avenue.  HENDERSON exited the vehicle and walked through the alley and met with a vehicle that was parked at a nearby business.  HENDERSON was witnessed engaging in what appeared to be a "hand to hand" drug transaction with the two unidentified occupants of this vehicle.  After meeting with the occupants of the vehicle, HENDERSON walked back in the direction of residence.

---

[3] This SOI has provided information that has led to the arrests and convictions of approximately twenty people for controlled substance related offenses; as well as the seizure of controlled substances.  The SOI is not a defendant or receiving monetary compensation for cooperating with law enforcement.  The SOI has continued to cooperate with law enforcement for several years because he/she hopes to help reduce crime in his/her neighborhood.  I am not aware of the SOI providing any/inaccurate information.

<u>Darnell KIMBROUGH's Involvement in the Drug Conspiracy</u>

62.     At approximately 1:52 p.m. on October 17, 2015, Juan MADRID called KIMBROUGH over Target Phone 3.  During this call, MADRID asked KIMBROUGH, "Well you think you get something today? Cause you got this nigga dying over here, man." KIMBROUGH told MADRID he wouldn't be able to meet the unidentified male who has the controlled substance until later in the day. MADRID replied, "Alright, give me one bro. I need it, ASAP." KIMBROUGH replied, "Okay."

63.     I believe that KIMBROUGH distributes marijuana to MADRID on occasion.  For example, at approximately 1:08 p.m. on October 27, 2015, Darnell KIMBROUGH called MADRID over Target Phone 3.  MADRID answered the phone, "Yeah, yeah, what up, what?" KIMBROUGH replied, "What up! Where is my [U/I] today?" MADRID responded, "Man, we are waiting, man.  We are [U/I] yet (that is, MADRID is telling KIMBROUGH he was still waiting for a resupply of controlled substance)." KIMBROUGH replied, "Mm-huh, smoke around (that is, KIMBROUGH had marijuana is available)." MADRID asked, "What's that?" KIMBROUGH responded, "It's good smoke (that is, it's good marijuana)." MADRID replied, "Yeah, I know, we are waiting, everybody is waiting (that is, MADRID was telling KIMBROUGH he is still waiting for a resupply of narcotics)." KIMBROUGH clarified, "I said, I got that good smoke around (that is, KIMBROUGH was telling MADRID he is in possession of high quality marijuana)." MADRID replied, "Oh…finally you got it, finally you remember I needed some." KIMBROUGH stated, "Yeah, I didn't have some, man (that is, KIMBROUGH just recently obtained an unknown quantity of marijuana)." MADRID responded, "Come on man, come on man.  Come [U/I] for your boy cus when we come, we gotta lookout for you (that is, MADRID was telling KIMBROUGH if KIMBROUGH looked out for him, MADRID will look out for KIMBROUGH when the resupply of narcotics arrives)." KIMBROUGH replied, "Yeah, I know. I didn't, I didn't have some, buddy.  Uh, I talked to [U/I] about the bullshit going around." MADRID

29

responded, "On a month or you got some right now (that is, MADRID was clarifying the KIMBROUGH was currently in possession of marijuana)?" KIMBROUGH replied, "Yeah (that is, KIMBROUGH was affirming he was currently in possession of marijuana)." MADRID replied, "Alright, I'm [Stutters] gonna hit you up like in [Stutters] twenty minutes. I need a whole one (that is, MADRID will call KIMBROUGH in twenty minutes and wants a pound of marijuana)." KIMBROUGH replied, "Alright." MADRID responded, "Alright, answer me." KIMBROUGH replied, "Yeah." MADRID replied, "Alright."

64.    At approximately 1:40 p.m. on October 27, 2015, MADRID called KIMBROUGH from Target Phone 3. During this call, MADRID asked, "Where can I see you at?" KIMBROUGH replied, "Shit, meet me at my house." Surveillance and the pole camera at 3430 Minger Road observed MADRID and KIMBROUGH arrive at the residence several minutes later. MADRID exited his vehicle and entered the front passenger seat of KIMBROUGH's vehicle. MADRID exited the vehicle a short time later and then left the residence in his vehicle and returned to 4930 Patricia Street.

65.    At approximately 8:31 p.m. on November 20, 2015, MADRID called Darnell KIMBROUGH over Target Phone 6. KIMBROUGH answered the phone, "Hello?" MADRID asked, "What's up, dude?" KIMBROUGH asked, "What up?" MADRID responded, "Nothing. You got, uh, you have any. smoke (that is, MADRID was asking KIMBROUGH if he had any marijuana)?" KIMBROUGH replied, "Nope." MADRID asked, "Huh?" KIMBROUGH responded, "Uh-uh." MADRID replied, "Alright. You think you got some tomorrow?" KIMBROUGH responded, "Yep." MADRID replied, "Yeah, I need some, Imma need some tomorrow. Try to get some good…some better than that." KIMBROUGH responded, "All right." BENITEZ replied, "Alright, man. I'll give you a call tomorrow." KIMBROUGH replied, "Alright." MADRID ended the call, "Alright."

66.     At approximately 2:47 p.m. on November 28, 2015, KIMBROUGH called BENITEZ over Target Phone 6.  During this call, KIMBROUGH told BENITEZ, "Man, I might need you man, I'm fucked up.  I need to make something, out of something (that is, KIMBROUGH was telling BENITEZ he made need to obtain a controlled substance that KIMBROUGH usually doesn't purchase from BENITEZ, presumably methamphetamine)."  BENITEZ asked, "Uh, what's going on?  What you trying to make?"  KIMBROUGH replied, "I don't give a fuck.  I need uh, that's the thing.  I need to find a way.  It's slow my way.  But shit, I got to make a way out of something (that is, KIMBROUGH was telling BENITEZ he's had trouble procuring the controlled substance he normally distributes, presumably cocaine and marijuana)."  BENITEZ told KIMBROUGH they could meet up later to talk about it.

67.     At approximately 3:45 p.m. on November 28, 2015, BENITEZ called KIMBROUGH from Target Phone 6.  During this call, BENITEZ asked KIMBROUGH, "You can grab a half, half a quad (that is, BENITEZ was asking KIMBROUGH if he could get two ounces of an unknown controlled substance, presumably marijuana)?"  KIMBROUGH replied, "I would have to go around there.  See some shit around there."  Later in this call, KIMBROUGH agreed to go pick up the controlled substance that BENITEZ needed ("Alright.  I'll go around there.")

Andre HARRIS' Involvement in the Drug Conspiracy

68.     On October 14, 2015, investigators intercepted calls on Target Phone 2 between JOHNSON and Target Subject Stevie DAVIS.  During this call at approximately 3:22 p.m., DAVIS stated, "Yeah, I need that tan, man (that is, heroin)."  JOHNSON responded "I got you.  I got that.  I got that whenever you ready."  DAVIS asked, "Shit, uh, what's the ticket on the, on the zip?   Same thing (that is, how much for an ounce)?"  JOHNSON replied, "Yeah, just the same thing, no change (that is, JOHNSON would be charging the same price DAVIS paid last time)."  DAVIS responded, "All right, uh, shit, yeah I need to come get it.  What was that ticket?  JOHNSON replied, "Twenty-two (that is,

31

$2200.00).” DAVIS replied, “Twenty-two?  Oh man!  I thought it was seventeen, man?” JOHNSON responded, “Hell no!  I aint, I aint never in my life sold nothing for no seventeen.”  At approximately 4:04 p.m., JOHNSON called DAVIS on Target Phone 2 and DAVIS answered, “What up baby?” JOHNSON replied, “Hey bro, you can’t come up with this whole—you can’t come up with two (that is, JOHNSON is affirming that DAVIS can’t come up with $2000.00 to heroin from JOHNSON).” DAVIS replied, “I got two, but I need to have a little bit of change.  What about nineteen (that is, DAVIS has the $2000.00 but can’t spend it all and asked JOHNSON if he’ll sell the heroin for $1900.00)?” JOHNSON responded, “All right, come with nineteen.  Let me know.  Call when you ready.” Investigators intercepted several more calls between DAVIS and JOHNSON over Target Phone 2.  During these calls, JOHNSON was heard giving DAVIS directions to his residence at 3010 Danbury Road.

69.     Investigators were monitoring the pole camera at JOHNSON’s Danbury Road residence on October 14, 2015, waiting for DAVIS to arrive.  At approximately 5:36 p.m., Target Subject Andre HARRIS arrived at JOHNSON’s residence.  HARRIS parked his vehicle and then walked up the driveway and met with JOHNSON and Target Subjects Christopher WILSON and Allen WILSON.  At approximately 6:26 p.m., investigators observed DAVIS arrive with his young daughter in the vehicle. DAVIS met with JOHNSON in the front yard of the residence and departed several minutes later in his vehicle.  Investigators followed the vehicle from JOHNSON’s residence until uniformed IMPD officers could conduct a traffic stop on the vehicle.  IMPD interdiction officers conducted a traffic stop on DAVIS’ vehicle and an IMPD narcotics K-9 indicated (i.e. “alerted”) on the vehicle.  A search of DAVIS and the vehicle did not yield the recovery of any controlled substances.  DAVIS was issued a warning and released by officers.

70.     At approximately 7:36 p.m. on October 14, 2015 DAVIS called JOHNSON on Target Phone 2 after he was released from the stop.  JOHNSON answered the phone, “What it do, bro?”

DAVIS responded, "You hot. You hot as firecrackers bro." JOHNSON asked, "What happened?" DAVIS replied, "Man, soon as I left your motherfucking crib and turned right, undercover Impala was following me with three other unmarked cars, bro.  Them bitches...I, I, I ditched them, where they couldn't see me, jumped in front of another whip and got rid of it (that is, DAVIS pulled in front of a car so the police vehicles following him couldn't observe DAVIS discarding the heroin he purchased from JOHNSON out the window). And soon as I got rid of it, bro, like the police—I'm looking at the—police coming, and they was following me trying to--." JOHNSON interjected, "Right." DAVIS continued, "They was following me trying to get a, trying to get a marked car to pull me over." JOHNSON affirmed, "Right." DAVIS continued, "I peeped them, bro, I swear for God, bro, when I turned off your block, the black Impala was coming my way.  I seen uh, the little white light that be hidden on the visors and shit." JOHNSON replied, "Yeah." DAVIS continued, "I peeped them lights on that bitch turn, so I'm peeping them the whole time.  It's three other unmarked cars.  They following me, so I'm turning in the turning lane then shifting back over, turn in the other lane, then I get past, I get on Kessler, them bitches following me.  So I'm speeding now, I jump in front of, I jump in front of a motherfucking, uh, truck just like mine and got, and got rid of it, bro, and soon when I got rid of it, about twenty-five, thirty seconds, you hear me?" JOHNSON responded, "Right." DAVIS continued, "About twenty-five, thirty seconds, bro, them bitches jumped on me and flicked the light (that is, DAVIS was pulled over by IMPD marked units)." JOHNSON replied, "What?!" DAVIS responded, "Man, them bitches pulled me over, bro, and hey, they ran the dogs through my shit two times, said the dog hit on something, so they searching my shit again.  I got my daughter with me, bro." Later in the conversation, DAVIS told JOHNSON, "Hey, that crib hot though (that is, law enforcement is watching JOHNSON's residence)." "I'm telling you with God love fam, if I wouldn't have been smooth like I was, bro—I be jammed up, I be jammed up." DAVIS told JOHNSON later in the conversation, "Hey, on everything I love, fam, on

my life, fam.  I had to, I had to ditch that demonstration, man (that is, DAVIS discarded the heroin)."

"Now, I got to go try to retrieve it (that is, DAVIS was going back to the scene of the traffic stop in an

attempt to locate the heroin).

71.     At approximately 7:57 p.m. on October 14, 2015, HARRIS called JOHNSON over

Target Phone 2.  HARRIS told JOHNSON he thinks he saw the black car with tinted windows drive by

(the surveillance vehicle described by DAVIS) when they were drinking in JOHNSON's driveway when

DAVIS arrived.  HARRIS told JOHNSON he wasn't sure if "they (referring to law enforcement)"

followed DAVIS to JOHNSON's house, or if they were just harassing people in the neighborhood.

JOHNSON told HARRIS to "keep your eye open too."

72.     At approximately 12:28 p.m. on October 16, 2015, JOHNSON received a call from

HARRIS on Target Phone 2.  JOHNSON answered the phone, "What up bro."  HARRIS replied, "Come

on out nigga.  I got to talk to you."  JOHNSON replied, "Okay."  Investigators monitoring the pole

camera observed HARRIS arrive in a vehicle at JOHNSON's residence.  JOHNSON then walked

outside and sat in the front seat of HARRIS' vehicle.  JOHNSON remained in HARRIS' vehicle for

approximately thirty minutes.  I believe this conversation pertained to the activity on October 14, 2015,

previously described above.  I believe HARRIS thinks there is validity to DAVIS telling JOHNSON that

JOHNSON and/or his residence are "hot."  I further believe this to be accurate based on an intercepted

call between HARRIS and Juan MADRID over Target Phone 3 that occurred at approximately 6:35 p.m.

on October 16, 2015.  During this call, MADRID called HARRIS and asked, "Hey, you don't want to

meet over at Mike's (JOHNSON) better?  I'm going that way."  HARRIS replied, "Yeah, nah I ain't over

there, it's hot over there (HARRIS believed there was law enforcement scrutiny at that residence)."

73.     At approximately 1:40 p.m. on November 25, 2015, JOHNSON utilized Target Phone 5

to call Andre HARRIS.  In that call, JOHNSON told HARRIS, "I need, uh…what you brought me last

time, but half of that (JOHNSON wanted half of the last drug order he had received from HARRIS)."
JOHNSON agreed to provide it: "Alright."  The call concluded with the two making plans to meet up.
Surveillance officers observed HARRIS arriving at JOHNSON's residence, 630 N. Livingston, a short
time later.  Further, investigators were monitoring the GPS location of one of HARRIS' cellular
telephones.  Based on this GPS data, it appears HARRIS drove directly from his residence at 5333 Holly
Springs Drive E to JOHNSON's residence.  Therefore, I believe the controlled substance that HARRIS
delivered to JOHNSON was stored in HARRIS' residence.

### Jonas DAY's Involvement in the Drug Trafficking Activity

74.     Jonas DAY has been identified as a drug associate of JOHNSON's; based on
investigation to date, I believe that DAY is purchasing controlled substances from JOHNSON and
JOHNSON will also purchase controlled substances from DAY.  For example, at approximately 7:53
p.m. on October 15, 2015, JOHNSON called DAY from Target Phone 2.  During this call, JOHNSON
asked DAY, "Where you at?" DAY replied, "I'm at the crib (I'm at my house)." JOHNSON told DAY,
"Bring me one through here real quick, man, cause I had sold my cousin a G-der out of mine and I ain't
got no more…(that is, JOHNSON was telling DAY to bring him a quantity of unknown controlled
substance, presumably one ounce)." JOHNSON continued, "…Just come through, bro (that is,
JOHNSON was telling DAY to deliver the controlled substance to his previous residence at 3010
Danbury Road)." DAY agreed, "Alright."

75.     At approximately 4:19 p.m. on November 24, 2015, JOHNSON and Jonas DAY were
intercepted over Target Phone 5.  In this call, DAY told JOHNSON, "I better try to get ready before the
holidays (Thanksgiving was two days later), cause I probably won't be able to catch up with you (DAY
wanted to re-up with JOHNSON before November 26, 2015).  JOHNSON asked, "Alright, what's
cracking? What you need?" DAY replied, "At least a, at least a three feezy (an unknown type and

quantity of controlled substance)." The two discussed the planned purchase, with JOHNSON eventually telling DAY, "I'll be on my way. Give me, like, uh, uh, give me like thirty minutes." There was a follow up call between the two target subjects at 5:08 p.m. that evening wherein JOHNSON said he would be there, "in like, fifteen minutes." Surveillance officers saw JOHNSON at DAY's residence, 3202 Normandy Road, roughly thirty minutes after this call.

76.     A computerized criminal history check (CCH) on Jonas DAY showed DAY has sustained convictions for controlled substance related offenses in the past; with the most recent conviction occurring in 2013. DAY's vehicle has been seen at his residence, 3202 Normandy Road, on numerous occasions during the course of this investigation; these sightings have occurred in the early morning hours, and have occurred on a near daily basis to the present time.

### Quietan ROBERTS' Involvement in the Drug Conspiracy

77.     Based on investigation to date, Quietan ROBERTS has been involved in the ongoing distribution of controlled substances with JOHNSON and others. On October 15, 2015, investigators intercepted calls between Quietan ROBERTS and JOHNSON on Target Phone 2 wherein the two agreed to meet. Investigators were monitoring the pole camera at JOHNSON's residence and observed ROBERTS arrive at JOHNSON's residence in a vehicle. After ROBERTS arrived, JOHNSON used Target Phone 2 to contact Michael SEARCY at (317) 384-0082. In this call, which occurred at approximately 4:39 p.m. on October 15, 2015, JOHNSON relayed he was, "Trying to get rid of that shit that you got (JOHNSON wanted to distribute drugs to ROBERTS)." SEARCY responded he was not going to be at his home for an hour ("it's going to be about an hour before I get out there,"), and asked JOHNSON if JOHNSON could go to SEARCY's house to get the controlled substances: "I mean, shit, if somebody there, you can go grab it. …You know my momma ain't going to trip off you, just tell her I left something there for you, shit, she ain't going to say nothing."

78.    At approximately 5:02 p.m., JOHNSON called SEARCY and asked, "You got a counter over there too (JOHNSON was asking SEARCY if he had a scale for JOHNSON to weigh the controlled substance he was selling to ROBERTS)?" ROBERTS replied, "Yep, [U/I]…yeah."

79.    Surveillance officers working on October 15, 2015 then followed ROBERTS and JOHNSON to 3301 Gerrard Avenue, SEARCY's residence. JOHNSON went inside the residence, and contacted SEARCY again utilizing Target Phone 2. In this call, SEARCY relayed it (the drugs) was in the "cream Pelli (a brand named jacket)…where all…stuff in there." JOHNSON asked for clarification, "All the business shit (all the drug related paraphernalia)? …Where the counter at (at the same location of the drug scale)?" SEARCY confirmed that was correct, but JOHNSON still could not immediately find the drugs: "I ain't see nothing. They (the drugs) where the bullets at?" SEARCY described in more detail where JOHNSON could find what he was looking for. JOHNSON stated, "Damn, I'm over here with all the bullets, I don't see nothing but bullets." SEARCY asked, "You see the wedding dress?" JOHNSON asked, "Is it inside a bag?" SEARCY responded, "Yeah, that big white bag." JOHNSON replied, "Yeah." SEARCY continued to direct JOHNSON to different locations until JOHNSON was able to find the quantity of controlled substance he was looking for.

80.    JOHNSON was then seen on October 15, 2015 exiting the residence, 3301 Gerrard Avenue, and was observed by investigators conducting a "hand to hand" drug transaction with ROBERTS.   ROBERTS was followed in his vehicle by investigators after he separated from JOHNSON.  ROBERTS was stopped by an IMPD uniformed officer.  ROBERTS was arrested for driving on a suspended license.  A quantity of marijuana was recovered from the center console of the vehicle.  After ROBERTS was arrested, SEARCY called JOHNSON on Target Phone 2 and discussed what JOHNSON had taken from inside 3301 Gerrard Avenue.  JOHNSON told SEARCY, "I took care

of bro. He only got one. I gave it to him for eighty though (that is, JOHNSON retrieved a quantity of unknown controlled substance from inside 3301 Gerrard Avenue and sold it to ROBERTS)."

81.     At approximately 5:41 p.m. on November 18, 2015, JOHNSON called BENITEZ on Target Phone 6 from Target Phone 5. During this call, JOHNSON told BENITEZ I just talked to the Mustang (JOHNSON was referring to ROBERTS as "the Mustang" because ROBERTS drives a Ford Mustang)." BENITEZ replied, "Yeah?" JOHNSON responded, "He said dude said it'll be tomorrow, though, on the other one." BENITEZ asked, "On the four?" JOHNSON replied, "Yeah but he said can he—he said can he uh grab one, he'll pay for it, and can you drop him off one (that is, JOHNSON was asking BENITEZ if ROBERTS paid for one ounce of controlled substance, would BENITEZ front the second ounce)?" BENITEZ replied, "Uh…man I got to charge extra to do that." As the conversation continued, BENITEZ told JOHNSON, "I can't be doing that right now. Not right now (BENITEZ told JOHNSON he was unwilling to front ROBERTS controlled substance)." JOHNSON replied, "Alright man, I'll tell him you can't do it right now."

82.     At approximately 6:10 p.m. on November 18, 2015, Juan MADRID and JOHNSON spoke over Target Phones 5 and 6. During this call, JOHNSON told MADRID, "Yeah, yeah, I was about to call bro (ROBERTS) back and tell him like uh what's a name said that uh he gonna see what he can do then. Cause he was like he remembered that you told him that he can uh get one and, and you'll let him get it one, so you know what I'm saying. He was like damn he said, he said they letting me do it now (that is, ROBERTS was under the impression that MADRID/BENITEZ were willing to front controlled substances to ROBERTS)." MADRID replied, "Yeah, you know how it is now (MADRID/BENITEZ are not fronting controlled substances to customers now." JOHNSON asked "Huh?" MADRID replied, "I said you know how it is now (MADRID was affirming that he is unwilling to front ROBERTS)." As the conversation continued, MADRID asked JOHNSON, "…do he want to get

one or what?" JOHNSON replied, "…he said [U/I] could he get a whole one?  He calling me now.  He calling me now and Imma call you right back."  The pen register on Target Phone 5 showed ROBERTS calling JOHNSON during this call between JOHNSON and MADRID.  A review of the pen register data over Target Phone 5 on this date, November 18, 2015, confirmed that ROBERTS and JOHNSON were, in fact speaking on that date (although no content was captured, as the wiretap for Target Phone 5 did not commence until November 19, 2015).

<u>Antonio ALLEN's Involvement in the Drug Conspiracy</u>

83.     Antonio ALLEN has been identified as another drug associate of BENITEZ's.  At approximately 1:56 p.m. on November 25, 2015, the two were intercepted speaking over Target Phone 6; in this call, ALLEN told BENITEZ to come by his residence, which he identified as, "4710 Sheehan Lane."  In a follow up call, which occurred at approximately 2:32 p.m. on November 25, 2015, ALLEN asked BENITEZ, "What you trying to get?"  BENITEZ replied, "It's me, Key."  ALLEN said, "Huh?"  BENITEZ repeated, "It's me, Key."  ALLEN told him, "OK, what you trying…you know my mind fucked up.  I got thirty motherfuckers I fuck with every day (ALLEN was having a hard time keeping his drug associates straight, which was difficult for him, due to the volume of drug trafficking he was engaging in).  What, what you trying to grab?"   BENITEZ told him he was headed that way.  Surveillance officers then observed BENITEZ going to ALLEN's residence, 4710 Sheehan Lane, and while still inside the house, at approximately 4:14 p.m. on November 25, 2015, BENITEZ was intercepted over Target Phone 6 speaking with MADRID.  In this call, BENITEZ relayed, "Hey, there's some good mustard (heroin) here."  MADRID asked, "should I bring money or what?"  BENITEZ responded, "Don't go over there (to ALLEN's).  I'll head over there (back to their residence on Patricia Street) shortly."

39

84.     At approximately 2:54 p.m. on November 29, 2015, ALLEN was intercepted speaking to BENITEZ over Target Phone 6.  In this call, ALLEN said, "I just got this for you. ...I said I got this shit for you (ALLEN had an unknown type of controlled substance for BENITEZ)."  BENITEZ asked, "Alright, you want, uh, you at your house?"  ALLEN confirmed that he was, and the call concluded with BENITEZ agreeing to go to ALLEN's residence, 4710 Sheehan Lane.  Surveillance officers confirmed that BENITEZ did, in fact, then go to ALLEN's residence.

## V.
## FIREARMS COUNTS

85.     Multiple individuals have been arrested in possession of firearms during the course of this investigation.  The arrests of three such individuals are summarized below.

Arrest of Darnell JACKSON

86.     On August 12, 2015, law enforcement officers were surveilling JOHNSON's former residence, 3010 Danbury Road in Indianapolis.  Officers saw a maroon Buick leave the residence, and followed it to the residence of 3236 Donald Avenue.  Officers observed the occupants exit the vehicle and enter the residence of 3236 Donald Avenue.  Officers maintained surveillance on the residence and vehicle.  A short time later, officers observed three individuals exit the residence and drive away in the maroon Buick.  Officers followed the Buick to a nearby apartment complex.  As officers were conducting surveillance in the area, officers heard shots fired in that complex.  An officer who was observing the maroon Buick watched three individuals run back into the maroon Buick immediately after hearing the shots being fired, and the vehicle then left the complex at a high rate of speed.  Due to the belief that the occupants of the Buick were likely involved in the shooting, a marked IMPD interdiction unit stopped the Buick.  Inside were three occupants, including front seat passenger Darnell JACKSON.  Upon stopping the car, the IMPD officer observed in plain view a firearm that was partially concealed on the front passenger floorboard.  The officer asked all three occupants to exit the car, and

the car was searched.  IMPD recovered a .40 caliber Ruger pistol in the vehicle from the front passenger floorboard.  I know from my training and experience that this pistol was manufactured outside the state of Indiana.

87.     Darnell JACKSON, who had been informed of his *Miranda* rights, admitted the pistol was his.  A review of JACKSON's criminal history demonstrates that he has a felony conviction for armed robbery, and a felony conviction for carjacking.  JACKSON was placed under arrest at that time.

<u>Seizure of Shotgun from BARNES</u>

88.     On October 8, 2015, the ATF was intercepting JOHNSON's Target Phone 2.   At approximately 12:21 p.m. on that date, BARNES called JOHNSON and said, "Hey, I need you to bring that, uh, whatchumacallit for [U/I] protection."  Although JOHNSON responded that he would be over shortly, surveillance at JOHNSON's former residence, 3010 Danbury Road, demonstrated that he did not immediately leave his home.  However, agents continued to monitor the pole camera at JOHNSON's residence on October 8, 2015.  At approximately 8:32 p.m. that evening, BARNES arrived at the home as a passenger in a silver/gray minivan, and JOHNSON and BARNES were seen speaking together in the driveway.  The two then went into JOHNSON's residence.  BARNES left the house approximately ten minutes later, got back into the passenger seat of the minivan, and left the residence.  Surveillance officers followed the minivan, and ultimately, a marked police vehicle stopped the minivan after the driver of the vehicle, later identified as BARNES' girlfriend, Shashona Clarke, was observed committing a traffic violation.

89.     The interdiction officer approached the vehicle, and immediately noticed the smell of burnt marijuana emanating from the minivan.  A subsequent search of the vehicle revealed a shotgun in the passenger compartment of the vehicle.  BARNES has a prior felony conviction for dealing a sawed off shotgun.  BARNES was informed of his *Miranda* rights, and he told the officer that he had just come

from a friend's house (whom he refused to name, but who I know to be Michael JOHNSON), and that he had gotten the shotgun there, which he wanted "for protection." BARNES was placed under arrest; the shotgun has been submitted for fingerprinting and DNA analysis. I know from my training and experience that the shotgun seized on October 8, 2015 was manufactured outside the state of Indiana.

November 24, 2015 Seizure of firearms from HOWARD

90.     At approximately 1:18 p.m. on November 24, 2015, JOHNSON was intercepted over Target Phone 5 speaking with Otis BOOSE; in this call, JOHNSON was requesting a firearm that he wanted to sell to a third party; BOOSE responded that he had two that he was willing to sell. In a follow up call that occurred at approximately 2:45 p.m., JOHNSON spoke to BOOSE and said he wanted to purchase both guns.

91.     In furtherance of this plan for JOHNSON to purchase firearms from BOOSE, JOHNSON was surveilled going to 3837 Bennett Drive at approximately 5:40 p.m. on November 24, 2015. At that time, there were other vehicles at Bennett Drive, including a Trailblazer. JOHNSON left the residence after approximately twenty minutes. At approximately 6:00 p.m. (right after JOHNSON left Bennett Drive), JOHNSON was intercepted over Target Phone 5 speaking to an unknown male; in that call, JOHNSON complained, "I was about to get these pistols off of Little B (Brian HOWARD) and shit for my dude (for the third party who wanted the guns), and shit. These niggas tell me they want three hundred for two pistols. I go round there, and this nigga talking about, I want two hundred for one. I was like, man, fuck this gun, nigga. Why you should have never told me that, my nigga was waiting. My nigga got three. He at, he buying both of them from me, but now yall talking about, he want two for this. Then he [U/I] they ain't, fuck all that. And he gonna come over there with a gang of guns in the car, but then you ain't gonna sell none, nigga? You stupid." In sum, I believe that JOHNSON was

42

complaining that he had come to an arrangement to purchase two pistols for $300 from BOOSE and HOWARD; however, when he got to Bennett Drive, they changed the price to $200 for each.

92.     Shortly after JOHNSON left Bennett Drive, HOWARD was observed leaving the Bennett Drive residence with Otis BOOSE as a passenger in the Trailblazer.   After HOWARD was observed committing traffic infractions (speeding and failing to signal a turn within two hundred feet of making a turn), a marked IMPD interdiction officer stopped HOWARD's vehicle.

93.     Upon stopping HOWARD's vehicle, HOWARD was asked for his driver's license; he told the officer his license had been suspended.   The IMPD officer could see a shotgun in plain view on the back seat of the vehicle.   Upon seeing the firearm, the officer requested the two occupants exit the vehicle for officer safety; the officer ran HOWARD and BOOSE's information and learned that HOWARD was a convicted felon, having been previously convicted of theft and receiving stolen auto parts.   The vehicle was searched, and officers ultimately recovered three firearms from the Trailblazer: a .762 SKS rifle; a shotgun; and a Grendel Inc.,.380 pistol.   I know from my training and experience that all three firearms were manufactured outside the state of Indiana.   Officers also found approximately six grams of heroin in the glove box of the car.   In a Marion County Jail recorded phone call following this arrest, HOWARD was intercepted speaking to another individual about the incident.   In this call, HOWARD told the other individual the police found "the two rifles I had in the car."

**VI.**
**REQUESTS FOR SEARCH WARRANTS**

94.     I am requesting search warrants for the following locations:

    a.     the residence located at 4930 Patricia Street, Indianapolis, Indiana (the residence of Luis Enrique BENITEZ and Juan MADRID, further described in Attachment A);

    b.     the residence located at 630 N. Livingston Avenue, Indianapolis, Indiana (the residence of Michael JOHNSON, further described in Attachment A);

43

     c.     the residence located at 1213 N. Rochester Avenue, Indianapolis, Indiana (the residence of Antwone FARRAL, further described in Attachment A);

     d.     the residence located at 3301 Gerrard Avenue, Indianapolis, Indiana (the residence utilized by Michael SEARCY and Antwone FARRAL, further described in Attachment A);

     e.     the residence located at 3236 Donald Avenue, Indianapolis, Indiana (the residence of Keith SPAIN and Donald HINKLE, further described in Attachment A);

     f.     the residence located at 1231 S. Moreland Avenue, Indianapolis, Indiana (the residence of Barbara WHITLEY, further described in Attachment A);

     g.     the residence located at 5333 Holly Springs Drive E, Indianapolis, Indiana (the residence of Andre HARRIS, further described in Attachment A);

     h.     the residence located at 3837 Bennett Drive, Indianapolis, Indiana (the residence of Kejuan HENDRICKS and Jimmy WELCH, and utilized by Otis BOOSE, further described in Attachment A);

     i.     the residence located at 3430 Minger Road, Indianapolis, Indiana (the residence of Darnell KIMBROUGH, further described in Attachment A);

     j.     the residence located at 1124 Hardin Boulevard, Apartment C, Indianapolis, Indiana (the residence of Lontrell SUTTON, further described in Attachment A);

     k.     the residence located at 283 N. Belleview Place, Indianapolis, Indiana (the residence of Quietan ROBERTS, further described in Attachment A);

     l.     the residence located at 3202 Normandy Road, Indianapolis, Indiana (the residence of Jonas DAY, further described in Attachment A);

     m.     the residence located at 4413 Thrush Drive, Indianapolis, Indiana (the residence utilized by Michael JOHNSON, further described in Attachment A);

<u>Characteristics of Residential Searches</u>

95.     In a substantial number of residential searches executed in connection with the drug and firearms investigations in which the ATF has participated, the following kind of drug-related evidence have typically been recovered:

      a.     Currency, currency wrappers, and devices used to count currency;

      b.     Drugs or money ledgers, drugs distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when drugs were obtained, transferred, sold, distributed, and/or concealed;

      c.     Drug paraphernalia, such as scales, wrapping paper, plastic bags, and packing materials, and diluting agents, such as methylsulfonylmethane, commonly known as MSM;

      d.     Financial instruments, precious metals, jewelry, other items of value, proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending sums of money derived from drug trafficking activities;

      e.     Articles of personal property and documents generated during their time trafficking drugs that establish and document the acquisition, movement, and spending of large sums of money generated from drug trafficking activities including: the purchase of real estate and conveyances, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds, ledger books, financial instruments purchased with large amounts of currency derived from the sale of heroin or other controlled substances, including wire transfers, traveler's checks, stock certificates, money orders, cashier's checks, and certificates of deposit, securities, letters of credit, and brokerage houses.  Documents pertaining to foreign and domestic bank accounts and their attendant generated from the sale of controlled substances;

45

f.     All state and federal income tax returns, whether individual or corporate returns, filed or not filed, and supporting work papers, summary sheets and analyses used in the preparation of the tax returns, or any other documents showing the employment or business history, whether or not such employment or business may be fictitious;

g.     Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes and documents, and other items, and reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

h.     Photographs and rolls of film;

i.     Records of off-site locations to store records, including safe deposit boxes, rental agreements for storage facilities, and other such records and receipts;

j.     Records and documents pertaining to assumed named aliases, including driver's licenses, passports;

k.     Records or documents evidencing travel within or outside of the State of Indiana, within or outside the United States, including passports, airline records, bus and train tickets, hotel records, and car rental records;

l.     Indicia of occupancy, residency, or ownership and control of the premises and other, off-site locations, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, settlement statements, addressed envelopes, escrow documents, and keys;

m.     Records of mail and communications services, telephone pagers, answering machines, electronic pagers, and cellular telephones, which evidence participation in a conspiracy to distribute controlled substances;

46

n.      Cellular telephones, telephone pagers, electronic pagers, answering machines (including information contained within these devices, such as the telephone number, and/or name and identity assigned to the phone; digital, cellular and/or telephone numbers, and/or names and identities stored in the directory; telephone numbers dialed from or received by the phone and stored in memory; stored voice mail recordings sent to the phone; stored text messages sent to, or sent from, the phone; stored photographs and videos; and any other electronic mail or any other electronic data stored within the phone and/or the memory of the phone);

o.      As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form;

p.      Any computer equipment and storage device  (such as a DVR or media storage device) capable of being used to commit, further or store evidence of the offense listed above;

q.      Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

r.      Firearms and other dangerous weapons;

s.      Any and all evidence of false and/or fictitious identification documents, to include, but not limited to, any state, federal, or international drivers licenses, birth certificates, passports, identification cards, credit cards or any other document utilized to conceal one's true identity; and

t.      Controlled substances.

96.      Based on my training and experience, I am aware that drug traffickers generally store their drug-related paraphernalia in their residences or the curtilage of their residences (to include

unattached out buildings), or in vehicles that are parked on the curtilage of their residences. Further, drug traffickers generally maintain records relating to their drug trafficking activities in their residences or the curtilage of their residences. Because drug traffickers often "front" (that is, sell on consignment) controlled substance to their customers, or alternatively, will be "fronted" controlled substances from their suppliers, such record keeping becomes necessary to keep track of amounts paid and owed, and drug traffickers typically maintain these records close at hand to readily ascertain current balances. Often, drug traffickers keep "pay and owe" records to show balances due for drug payments in the past ("pay") and for payments expected ("owe") to and from the trafficker's supplier and the trafficker's dealers. Additionally, drug traffickers typically maintain telephone and address listings of customers and suppliers and keep them immediately available so that they can efficiently conduct their drug trafficking business.

97.     It is also a common practice for traffickers to conceal large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances, at their residences. In this connection, drug traffickers typically use wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also typically maintain evidence of such financial transactions and records relating to income and expenditure of money at their residences or the cartilage of their residence.

98.     Typically, drug traffickers possess firearms and other dangerous weapons at their residences to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the trafficker's profits or supply of drugs.

99.     I know that computer hardware, software and electronic files may be important to a criminal investigation because the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure

permits the government to search for and seize computer hardware, software and electronic files that are evidence of crime, contraband, instrumentalities of crime, and or fruits of crime.   In this case, the warrant application requests permission to search and seize records and documents relating to the trafficking of the substances identified in this investigation.   These records constitute evidence of crime. This affidavit also requests permission to seize the computer hardware that may contain these records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search offsite. This affiant believes that, in this case, the computer hardware is a container for evidence and also an instrumentality of the crimes under investigation.

100.    Based on my knowledge, training and experience, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment.   This is true because of the following:

a.    The volume of evidence.   Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of information.   Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.   This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime.   This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

b.    Technical requirements.   Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.   The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system

and its data.  In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recorder even "hidden," erased, compressed, password-protected, or encrypted files.  Because computer evidence is vulnerable to inadvertent or intentional modification or destruction, a controlled environment may be necessary to complete an accurate analysis.  Further, such searches often requires the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

101.    In light of these concerns, I request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agent executing the search concludes that it would be impractical to search the computer hardware on-site for this evidence.

102.    I know that cellular telephones may be important to a criminal investigation because cellular telephones may be evidence or instrumentalities of crime, and/or may be used as storage devices that contain evidence of crimes in the form of electronic data.  In this case, the warrant application requests permission to search and seize records relating to the trafficking of the substances identified in this investigation.  These records constitute evidence of crime.  I also request permission to seize the cellular telephones that may contain these records and search the memory of the cellular telephones. I believe that, in this case, cellular telephones (including saved voice mails and text messages) are a container for evidence and instrumentalities of the crimes under investigation.

103.    My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arises from the following: my involvement in

prior drug investigations and searches during my career as a law enforcement officer, as previously described; my involvement on a number of accessions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and other intelligence information provided through law enforcement channels.

104.     In a number of residential searches in prior investigations that I have been involved in, the types of evidence identified in Attachment "B" have typically been recovered from the main residence and from other structures and areas on the properties being searched, for example, other storage lockers/areas, detached closets, containers, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence (including vehicles that are maintained and stored on the curtilage of a main residence).

<u>Residences Involving the Named Defendants and Other Coconspirators</u>

105.     Luis BENITEZ and Juan MADRID currently live at 4930 Patricia Street, Indianapolis, Indiana. We have been utilizing a pole camera at that location for more than two months, and have seen them there on a daily basis. Both BENITEZ and MADRID have been surveilled there as recently as December 6, 2015.

106.     Michael JOHNSON currently lives at 630 North Livingston Avenue, Indianapolis, Indiana. JOHNSON moved into this residence in early November 2015, and has been surveilled there on a daily or near-daily basis since that time.

107.     Antwone FARRAL currently lives at 1213 North Rochester Avenue, Indianapolis, Indiana. FARRAL's vehicles have been parked there on a consistent basis for the last month, and FARRAL has been surveilled there on multiple occasions. On December 5, 2015, FARRAL was stopped by an IMPD officer for a traffic violation. FARRAL told the officer he was traveling to his

residence at 1213 North Rochester Avenue.  Furthermore, FARRAL has reported this as his current residence to Bureau of Motor Vehicles.

108.   Michael SEARCY currently lives at 3301 Gerrard Avenue, Indianapolis, Indiana; through this investigation, numerous targets of this investigation, including Michael JOHNSON, have utilized this residence in furtherance of the drug trafficking activity.  As detailed above, on October 15, 2015, JOHNSON was communicating with SEARCY over Target Phone 2.  During this call, SEARCY directed JOHNSON to look for controlled substances that were hidden in specific locations inside the residence.  After JOHNSON exited the residence, he was observed conducting a "hand to hand" drug transaction with Quietan ROBERTS.   BENITEZ continues to utilize 3301 Gerrard Avenue in furtherance of the drug trafficking activity; as detailed below.  On November 22, 2015, BENITEZ received a call from Andre HARRIS on Target Phone 6.  Based on previously intercepted calls, BENITEZ was meeting HARRIS to return a quantity of marijuana BENITEZ had previously purchased. During this call, HARRIS told BENITEZ, "Uh…meet me at Mikey momma house." BENITEZ replied, "Alright, I'll be there." Police surveillance observed HARRIS and BENITEZ meet at the residence of 3301 Gerrard Avenue.  GPS information for BENITEZ's Honda Accord demonstrates that BENITEZ's car was most recently at 3301 Gerrard Avenue during this November 22, 2015 incident.  A review of GPS information for BENITEZ's vehicle demonstrates that since mid-July 2015, BENITEZ's vehicle has been to 3301 Gerrard Avenue on forty-four occasions, only remaining at the residence for a short period of time.  Based on my training and experience, as well as from my involvement in this investigation specifically, I believe these multiple short stops at 3301 Gerrard Avenue are consistent with BENITEZ's drug distribution activities, as he has been observed on numerous occasions distributing controlled substances, and on those numerous occasions, he completes that distribution in a short time period and then leaves.

109.    I believe that 3301 Gerrard Avenue continues to be used for drug trafficking purposes. On December 6, 2015, surveillance officers were watching this residence, and at approximately 3:00 p.m., surveillance officers observed Michael SEARCY arriving at the residence in his maroon Chevrolet Malibu. SEARCY and two juveniles were witnessed going into the residence, with SEARCY appearing to unlock the front door prior to entering. At approximately 3:10 p.m., an unidentified black male walked up to 3301 Gerrard Avenue, entered, and then left approximately five minutes later. At approximately 3:43 p.m., a white van arrived at the residence, and a black male was witnessed entering the residence, who then left approximately five minutes later. At approximately 5:57 p.m., surveillance officers observed a green Toyota arrive at 3301 Gerrard, and they observed a black male enter the residence, then leave approximately three-five minutes later. At approximately 6:40 p.m., officers observed a black Nissan arrive at the house; officers saw a white male walk into the residence, and then leave approximately five minutes later. Surveillance units attempted to follow and stop the Nissan, but were unsuccessful. At approximately 7:07 p.m., SEARCY was observed leaving his Gerrard Avenue residence. SEARCY was followed to a Speedway gas station at 3400 Georgetown Road. Surveillance units witnessed SEARCY go into the business, at which time one of the surveillance officers observed what appeared to be a firearm on SEARCY's right hip concealed under his clothing (SEARCY does have a concealed firearms carry permit). Based on my training and experience, the observations of December 6, 2015 are consistent with distributing narcotics out of that residence. On December 6, 2015 from approximately 1500 hours to 1900 hours, surveillance units were monitoring the activity at 3301 Gerrard Avenue.

110.    Keith SPAIN and Donald HINKLE currently live at 3236 Donald Avenue, Indianapolis, Indiana. I currently have judicial authorization to receive precision location information on SPAIN's phone; that information demonstrated that SPAIN has been at this location through the early morning

hours on nearly a daily basis.  Both SPAIN and HINKLE have been surveilled there on a near daily basis until the current time.  Further, BENITEZ and MADRID have been observed on the pole camera at the residence, delivering controlled substances to the residence after being

111.    Barbara WHITLEY currently lives at 1231 S. Moreland Avenue, Indianapolis, Indiana. WHITLEY has been surveilled going to this residence on multiple occasions, and WHITLEY has also reported this as her current address to Bureau of Motor Vehicles.  JOHNSON has been surveilled going to this residence on multiple occasions in furtherance of their joint methamphetamine distribution activities.

112.    Andre HARRIS currently lives at 5333 Holly Springs Drive E, Indianapolis, Indiana. HARRIS is the leaseholder on this address; moreover, until approximately November 29, 2015, I had judicial authorization to receive precision location information on HARRIS's phone; that information demonstrated that HARRIS has been at this location through the early morning hours on a daily basis.

113.    Kejuan HENDRICKS and Jimmy WELCH currently live at 3837 Bennett Drive, Indianapolis, Indiana, which is leased by HENDRICKS' parents, who also reside there.  HENDRICKS and WELCH have both reported 3837 Bennett Drive as their current residence.  This residence is also frequented by Otis BOOSE, who has been intercepted over Target Phone 6 referring to this residence as "mom's house".  As detailed above, BENITEZ has delivered controlled substances to BOOSE at this residence on numerous occasions.  GPS information for BENITEZ's Honda Accord demonstrates that BENITEZ's car was most recently at 3837 Bennett Drive on December 4, 2015.  A review of GPS information for BENITEZ's vehicle demonstrates that since mid-July 2015, BENITEZ's vehicle has been to 3837 Bennett Avenue on forty-three occasions, typically only remaining at the residence for a short period of time.  Based on my training and experience, as well as from my involvement in this investigation specifically, I believe these multiple short stops at 3837 Bennett Drive are consistent with

BENITEZ's drug distribution activities, as he has been observed on numerous occasions distributing controlled substances, and on those numerous occasions, he completes that distribution in a short time period and then leaves.

114.   Darnell KIMBROUGH currently lives at the residence located at 3430 Minger Road, Indianapolis, Indiana.  We have a pole camera at this location, and KIMBROUGH has been observed there on a near daily basis until the current time.  I currently have judicial authorization to receive precision location information on KIMBROUGH's phone; that information demonstrated that KIMBROUGH has been at this location through the early morning hours on nearly a daily basis. Further, at approximately 1:40 p.m. on October 27, 2015, MADRID called KIMBROUGH from Target Phone 3.  During this call, MADRID asked, "Where can I see you at?" KIMBROUGH replied, "Shit, meet me at my house." Surveillance and the pole camera at 3430 Minger Road observed MADRID and KIMBROUGH arrive at the residence several minutes later.

115.   Lontrell SUTTON currently lives at 1124 Hardin Boulevard, Apartment C, Indianapolis, Indiana.  SUTTON's vehicle has been seen at this location on numerous occasions during the course of this investigation; these sightings have occurred in the early morning hours, and have occurred on a near daily basis to the present time.  As described above, SUTTON has obtained controlled substances from JOHNSON on multiple occasions during the wiretap investigation; following those occasions, SUTTON was followed back to the Hardin Boulevard address.  Management at this apartment complex was contacted in December 2015; that individual indicated that although there was a female on the lease, a male (who was described in a manner fitting SUTTON's appearance) also lives there.  On December 5, 2015, investigators were conducting surveillance at 1124 Hardin Boulevard.  Surveillance officers observed SUTTON and the female leaseholder of 1124 Hardin Boulevard, Apartment C, walk out of building 1124 together with a small child.  SUTTON, the female leaseholder and small child all drove

away from the complex in SUTTON's vehicle.

116.     Quietan ROBERTS currently resides at 283 N. Belleview Place, Indianapolis, Indiana.  I currently have judicial authorization to receive precision location information on ROBERTS' cell phone; that information confirms that ROBERTS' lives there (that is, the 'pings' for his cell phone routinely place him at 283 N. Belleview Place in the early morning hours).  Moreover, ROBERTS has reported this as his current residence to Bureau of Motor Vehicles.

117.     Jonas DAY currently resides at 3202 Normandy Road, Indianapolis, Indiana.  DAY has been surveilled at this residence on numerous occasions, and, as set forth above, JOHNSON has delivered controlled substances to DAY at this location.  DAY's vehicle has been seen at this location on numerous occasions during the course of this investigation; these sightings have occurred in the early morning hours, and have occurred on a near daily basis to the present time.

118.     Michael JOHNSON currently utilizes 4413 Thrush Drive, Indianapolis, Indiana to distribute controlled substances; JOHNSON and BENITEZ have been utilizing the residence for this purpose since JOHNSON moved to Livingston Avenue in November 2015.  JOHNSON has been seen going to this residence on a daily or near daily basis since that time; JOHNSON was most recently at this residence on December 5, 2015.  Wiretap intercepts demonstrate that JOHNSON and BENITEZ's visits are tied to their drug trafficking activities.  As detailed above, on November 18, 2015, JOHNSON and BENITEZ were communicating over Target Phones 5 and 6." After JOHNSON told BENITEZ he needed one ounce of methamphetamine, BENITEZ told JOHNSON, "Hey, I'll see you at Mel's in about five minutes." Police surveillance observed BENITEZ and JOHNSON arrive at 4413 Thrush Drive a few minutes later.  Later that day, BENITEZ and JOHNSON agreed to meet at 4413 Thrush Drive for JOHNSON to obtain approximately eight ounces of methamphetamine that JOHNSON redistributed to Christopher HARRIS and Tyrika EVANS.  Further, on November 21, 2015, Andre HARRIS was

intercepted talking to BENITEZ over Target Phone 6. HARRIS agreed to deliver BENITEZ a quantity of controlled substance. During this call, BENITEZ asked HARRIS, "...you know where Mel's at?...Yeah, fat Mel." HARRIS replied, "Yeah." BENITEZ and HARRIS agreed to meet at 4413 Thrush Drive. GPS information for BENITEZ's Honda Accord demonstrates that BENITEZ's car left 4930 Patricia Street and traveled to 4413 Thrush Drive shortly after this call occurred. GPS information for BENITEZ's vehicle further shows that this vehicle was most recently at 4413 Thrush Drive on November 24, 2015.

119. A review of GPS information for BENITEZ's vehicle demonstrates that since mid-July 2015, BENITEZ's vehicle has been to 4413 Thrush Drive on thirty-five occasions, typically only remaining at the residence for a short period of time. Based on my training and experience, as well as from my involvement in this investigation specifically, I believe these multiple short stops at 4413 Thrush Drive are consistent with BENITEZ's drug distribution activities, as he has been observed on numerous occasions distributing controlled substances, and on those numerous occasions, he completes that distribution in a short time period and then leaves. JOHNSON was most recently at the Thrush Drive address on December 5, 2015.

120. Johnny HENDRICKS currently lives at 4055 Pittman Place, Indianapolis, Indiana. 4055 Pittman Place is owned by Shenika Poindexter; Poindexter is also the registered owner of a 2004 Dodge Ram pickup truck that HENDRICKS routinely drives. Despite not being the owner of the residence, HENDRICKS has been seen on multiple occasions arriving/departing from the residence and appears to have unfettered access to the home. HENDRICKS has been most recently surveilled at this residence on December 5, 2015.

121. Antonio ALLEN currently resides at 4710 Sheehan Place, Indianapolis, Indiana. Antonio ALLEN currently resides at 4710 Sheehan Place, Indianapolis, Indiana. As set forth in detail above,

ALLEN has been intercepted communicating with BENITEZ over Target Phone 6. During one of these calls on November 25, 2015, ALLEN told BENITEZ, "...type my address. It's uh forty-seven, ten Sheehan Lane." I know the correct address is 4710 Sheehan Place based on my surveillance of BENITEZ and ALLEN following this call. Sheehan Lane is a very short street that connects North High School Road and Sheehan Place. ALLEN continued to give BENITEZ more specific directions and referred to this residence as "my house." ALLEN sent BENITEZ a follow up SMS message confirming his address as "4710 Sheehan Lane right in the Willow (I know the correct address to be 4710 Sheehan Place)." After BENITEZ arrived at the residence, he was intercepted on Target Phone 6 talking to Juan MADRID talking about a quantity of heroin inside this residence. On November 29, 2015, ALLEN was intercepted speaking with BENITEZ on Target Phone 6. During this call, ALLEN told BENITEZ, "I got this shit for you...Yeah, I'm at the crib (that is, ALLEN had a quantity of controlled substance for BENITEZ and was at his residence). Police surveillance observed BENITEZ leave his residence and drive to the residence of 4710 Sheehan Place. BENITEZ was observed meeting with ALLEN, presumably to obtain the quantity of controlled substance that was discussed in the previous call. Police surveillance has observed ALLEN drive three different vehicles during the course of this investigation. These vehicles have been seen at this location on numerous occasions since November 25, 2015; these sightings have occurred in the early morning hours, and have occurred on a near daily basis to the present time. ALLEN has been surveilled leaving the residence in these vehicles and has been observed conducting "hand to hand" drug transactions with several unidentified individuals. ALLEN was followed back to this residence after he was witnessed conducting these drug transactions. A review of the GPS information for BENITEZ's Honda Accord demonstrates that BENITEZ last traveled to this residence on December 6, 2015.

122. Dontrell HENDERSON currently resides at 950 N. Pershing Avenue, Indianapolis,

Indiana.  HENDERSON's vehicles have been parked there on a consistent basis for the last month, and

HENDERSON has been surveilled there on multiple occasions.  Furthermore, HENDERSON has

reported this as his current residence to Bureau of Motor Vehicles.  As set forth in detail above,

HENDERSON is believed to have purchased controlled substance from JOHNSON during the course of

this investigation.   On October 27, 2015, HENDERSON was intercepted communicating with

JOHNSON over Target Phone 2.  During this call, HENDERSON and JOHNSON were discussing

heroin. HENDERSON told JOHNSON "Oh yeah, just in case you run out of something, you can always

hit me.  I keep plenty of it." CS-1 stated he/she has observed HENDERSON distributing heroin with the

past week.  Further, police surveillance has observed HENDERSON engage in what were believed to be

"hand to hand" drug transactions in close proximity to this residence.

## VII.
## CONCLUSION

123.    The government requests the Court to maintain this Affidavit and all related documents

remain under seal until further order of the Court.  This Affidavit contains extensive reference to court-

authorized wire surveillance.  Disclosure of the electronic surveillance at this time would jeopardize an

ongoing ATF investigation.   Disclosing the contents of this Affidavit would alert targets of this

investigation to the existence of the ATF investigation in this matter.  As a result, the targets may flee

the jurisdiction and destroy evidence that the ATF might otherwise obtain during the course of the

ongoing investigation.

124.    I have requested that the search warrants for several of the target residences be "no

knock" warrants.  As set forth above, the occupants of many of these residences and their associates are

known to possess firearms.  For example, JOHNSON has been intercepted distributing, and attempting

to purchase, firearms in the course of this investigation.  BENITEZ has previously been convicted of

shooting into a dwelling in California.  Furthermore, CS-1 has heard BENITEZ, MADRID, and

JOHNSON all discussing firearms that they possess (and has seen JOHNSON in possession of firearms).  As set forth above, CS-1 has further indicated that FARRAL is believed to have recently conducted a home invasion robbery.  As stated above, intercepts confirm that SEARCY keeps bullets (and therefore, presumably one or more firearms) at his residence.  SPAIN has a prior conviction involving firearms (carrying a handgun without a license); moreover, he and HINKLE were also present for the 'shots fired' incident of August 12, 2015 that is described above, which resulted in the arrest of Darnell JACKSON).  ROBERTS also has a prior firearm related arrest for armed robbery from 1999. ALLEN has prior arrests for being a serious violent felon in possession of a firearm and armed robbery, ALLEN was also convicted in a separate incident of robbery.  HENDERSON has previously been arrested for murder.

125.    While I do not have any specific information regarding WHITLEY and her access to firearms, I know that as to WHITLEY's residence, there are multiple surveillance cameras on the property.  Based on my training and experience, I know that drug traffickers often utilize these cameras, among other reasons, to attempt to obtain as much notice as possible of police presence so that they may destroy evidence before it is seized by officers.  Given these concerns, I believe a no-knock search warrant is justified for these locations as well.

WHEREFORE, based upon the information contained in this Affidavit, probable cause exists to believe that the articles identified on Attachment "B" are present at the premises to be searched. Probable cause further exists to arrest the individuals named above at paragraph 5, for the crimes articulated in paragraph 5.

Todd J. Bevington, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn to and subscribed to me this
8th day of December, 2015.

Mark J. Dinsmore
Magistrate Judge
Southern District of Indiana